## STATE EX REL. STANDARD OIL CO. v. BLAISDELL, Secretary of State.

(132 N. W. 769.)

**Constitutional law — separation of powers.**

1. The people, through the Constitution of this state, have created three departments of government, each supreme in its own sphere.

**Constitutional law — judicial power.**

2. Section 85, N. D. Const. vested the judicial power of the state in a supreme court, district courts, county courts, justices of the peace, and in such other courts as may be created by law for cities, incorporated towns, and villages.

**Constitutional law — vesting judicial power in secretary of state.**

3. The secretary of state is not a judicial officer, under the Constitution, and judicial power cannot be vested in him.

**Constitutional law — separation of powers — definition of judicial power.**

4. While it is extremely difficult to formulate any definition of judicial power which will be applicable to all cases, it may be said in general that it is authority vested in some court, officer, or person to hear and determine when the rights of persons or property, or the propriety of doing an act, are the subject-matter of adjudication.

**Constitutional law — separation of powers — judicial power.**

5. Official action, the result of judgment or discretion, in such cases is a judicial act.

**Constitutional law — conferring judicial power on secretary of state.**

6. Section 2 of chapter 258 of the Laws of 1907 provides that, when complaint shall be made to the secretary of state that a corporation chartered in this state, or authorized to do business therein, has been guilty of unfair discrimination,

he shall issue a notice fixing a date for hearing on such charge; and that, if in the opinion of the secretary of state such corporation has been intentionally or wilfully guilty of unfair discrimination for the purpose of destroying or preventing competition, or for such purpose shall wilfully refuse to sell the commodities in which it deals, he shall so find, and make a record of such finding upon the records of his office, and shall at once forfeit the charter of the corporation, if domestic, or revoke and forfeit its permit to do business in the state, if a foreign corporation. *Held*, that these provisions require the secretary of the state to hear evidence for and against, determine the relative weight thereof, the intent of the corporation charged, to find the facts, and to apply the law thereto, and, if he finds such acts are not innocently done, to impose a penalty, and that such provisions require, on the part of the secretary of state, the exercise of judgment or discretion upon the evidence admitted, as to intent and purpose, and it amounts to a notice and trial, and a judgment of acquittal or conviction, as, in the opinion of the secretary of state, the facts and law require. *Held* further, that the duties above referred to are clearly judicial in their nature; and that so much of said chapter as relates to the duties of the secretary of state in determining whether to cancel charters of domestic corporations or revoke permits of foreign corporations is obnoxious to § 85 of the Constitution of this state, and therefore void.

**Constitutional law — due process — forfeiture of charter of corporation.**

7. The provisions of chapter 258, Laws 1907, supra, above referred to, are void for the further reason that the proceedings contemplated do not constitute due process of law.

Opinion filed September 20, 1911.

Appeal from District court, Burleigh county; *Winchester*, J.

Application by the Standard Oil Company for a writ of certiorari to Alfred Blaisdell, as Secretary of State. From a judgment for defendant, relator appeals.

Reversed.

*Alfred D. Eddy, Robert W. Stewart,* and *Ball, Watson, Young, & Lawrence,* for appellant.

*Andrew Miller,* Attorney General, and *C. L. Young,* Assistant Attorney General, for respondent.

SPALDING, J.    This appeal involves proceedings taken under chapter 258 of the Laws of 1907. The act in question reads as follows:

"Sec. 1. Any person, firm, or corporation, foreign or domestic, doing business in the state of North Dakota and engaged in the production,

manufacture, or distribution of any commodity in general use, that shall intentionally, for the purpose of destroying or preventing competition, discriminate between different sections, communities, or cities of this state, by selling any such commodity at a lower rate or price in one section, community, or city, or any portion thereof, than is charged for such commodity in any other section, community, or city, after equalizing the distance from the point of manufacture, production, or distribution and freight rates therefrom, or who shall wilfully, for the purpose of such discrimination and unfair competition, refuse to sell any commodity in general use, and in the manufacture, production, or distribution of which such person, firm, or corporation may be engaged, to any other person, firm, or corporation which may desire to purchase the same, and who shall comply with all reasonable regulations of such person, firm, or corporation, and who shall tender payment therefor,— shall be deemed guilty of a misdemeanor.

"Sec. 2.   If any complaint is made to the secretary of state that any corporation chartered in this state, or authorized to do business therein, is or has been guilty of unfair discrimination within the terms of this act, it shall be the duty of such secretary to at once institute an inquiry as to such discrimination, giving the corporation complained of notice of such complaint and an opportunity to be heard, and if, in the opinion of such secretary of state, any corporation, foreign or domestic, shall have been guilty of any such unfair discrimination under the terms of this act, the said secretary shall so find, and shall make a record of such finding upon the records in his office, and shall at once forfeit the charter of such corporation, if it be a domestic corporation, or, if it be a foreign corporation, he shall immediately revoke and forfeit its permit to do business in this state.

"Sec. 3.   If, after the revocation of such charter in the case of a domestic corporation, or of its permit if it be a foreign corporation, any such corporation shall continue or attempt to do business within this state, it shall be the duty of the attorney general of this state, by a proper action commenced in the name of the state, to oust such corporation from any and all business of any kind or character within the state of North Dakota.

"Sec. 4.   Any firm, person, or corporation violating any of the provisions of this act, shall upon conviction thereof forfeit to the state of

North Dakota a sum not less than $200 nor more than $500 for each and every violation of this act, said sum to be recovered by action commenced by the attorney general in the name of the state of North Dakota in any court of competent jurisdiction. All sums so collected shall be credited to the general school fund of this state.

"Sec. 5. Nothing in this act contained shall in any manner be construed as repealing, or in any manner altering, any other act or part of act heretofore adopted by the legislature of this state, but the remedies herein provided shall be cumulative to all other remedies now existing."

On the 15th day of April, 1908, the attorney general of the state filed with the secretary of state an unverified document, called "a complaint," wherein, among other things, it was stated that complaint had been made and evidence furnished him showing that the Standard Oil Company, a corporation of the state of Indiana, had violated the provisions of said chapter by discriminating between different sections of this state in the prices of commodities sold by it, and that he, as attorney general, charged the Standard Oil Company with having violated said chapter by such discrimination, "in this, that said Standard Oil Company aforesaid has on divers and different dates during the year 1908 charged dealers and consumers in this state for commodities sold by the said company, to wit, oil and gasolene, different prices for the same quality of such oil and gasolene; that said company charged higher prices per gallon for the same grade of oil and gasolene in one locality of this state than it did for the same quality of oil and gasolene in another locality of this state, at equal distances from the place of shipment, and in which the freight rates for shipping there were the same," and asking the secretary of state to serve notice on said Standard Oil Company of Indiana, "apprising them of such charges herein, and setting a time and place at which they may appear and show cause, if any they have, why the certificate of authority issued to said company on the 23d day of December, 1895, authorizing them to do business in the State of North Dakota, as a foreign corporation, should not be revoked and forfeited." Upon the same day the secretary of state issued and mailed to the said Standard Oil Company notice of such complaint, and that he was about to institute an inquiry as to such alleged discrimination, and ordering it to appear before him at his office in the city of

Bismarck on the 1st day of June, 1908, at 10 o'clock in the afternoon, and show cause, if any there be, why the benefits, privileges, and permission to do business in this state, as given by law to foreign corporations, should not be immediately revoked and forfeited. On the 26th day of May, 1908, Honorable W. H. Winchester, Judge of the Sixth Judicial District, granted an order to show cause, returnable on the 1st day of June, 1908, why a writ of certiorari should not issue commanding said secretary of state to certify fully to that court, and to annex to such writ of certiorari a transcript of the record and proceedings had before such secretary of state in the matter referred to, that his proceedings thereon might be reviewed by such court. Such order to show cause was based upon the affidavit of W. P. Cowan, a vice president of the Standard Oil Company, a corporation, wherein he alleged the incorporation thereof, the granting to it of permission to do business in the state of North Dakota according to the laws thereof in 1895, and its compliance in all respects with such laws. He then sets out in his affidavit the proceedings pending in the office of the secretary of state to which reference has been made, and that, upon calling upon that official for a certified copy of all documents or writings filed in his office in connection with the charges referred to as a basis therefor, he was informed by said secretary of state that no other papers or documents than the complaint of the attorney general were on file therein. He also alleges that the complaint filed with the secretary of state by the attorney general does not state any violation of said chapter 258 by or on the part of said Standard Oil Company, in that it does not set forth or state any specific instance or cause of violation, or aver any facts upon which a conclusion could be found that said law had been violated, and does not attempt to set forth or charge that any alleged violation of the terms of said act was done intentionally for the purpose of destroying or preventing competition, to discriminate between different sections, communities, or cities of North Dakota, and that the secretary of state was exceeding his jurisdiction in issuing and serving the order to show cause referred to, in that his acts were without authority of law, and that he was exercising powers and authority not conferred upon him and wholly judicial in their nature; that, unless prevented by an order of the court, such secretary would proceed to a so-called inquiry or investigation, and in deponent's belief would pretend to revoke or

cancel said corporation's authority to do business in this state. He shows the great extent of the business of the Standard Oil Company in this state, the nature and value of its property therein, and asserts other grounds for claiming the proceedings taken and the law invalid, none of which is it necessary to detail here. On the return day of the order to show cause, the Honorable T. F. McCue, Attorney General, appeared for the secretary of state, and moved to quash the application for the writ of certiorari on each of several grounds, denying the correctness of the contention of the relator. He also made return, setting forth the proceedings had, and alleging that he had in all things complied with the provisions of the statute referred to. Upon argument based upon the files in the case, the affidavit of said Cowan, and the return of the secretary of state, the writ was denied and the order to show cause quashed, and the proceedings had at the instigation of the relator dismissed. Judgment was entered accordingly. From this judgment the relator is here on appeal.

The appellant filed an elaborate brief in this court more than two years ago. No brief was ever filed on the part of the secretary of state, and much delay was occasioned in the hearing and consideration of the matter by this failure. Before argument a new attorney general and a new secretary of state had assumed the duties of the offices. The assistant attorney general appeared on the argument before this court, and stated that the office of attorney general did not desire to argue the case; that they deemed it due the court and themselves and the office of the secretary of state that explanation be made regarding the state's position; that when the change occurred in the office of the attorney general no brief had been filed or prepared, and that the new officers spent some time in attempting to find authorities sustaining the action of the secretary of state and the district court, but that they were unable to find any cases, which had not been overruled, that would sustain the position of the state; that thereupon the matter was submitted to former Secretary of State Blaisdell, who spent considerable time, with the aid of outside counsel, in investigation, and at length informed the attorney general that he would be unable to prepare a brief defining his position in the matter; that the attorney general's office felt, under the circumstances, it would be folly to try to make out a case. However, the attorney general declined to consent to a reversal of the judgment.

Our view of the law renders it unnecessary to pass upon several of the grounds relied on by appellant for a reversal. It will be observed that the statute does not expressly require the complaint to be verified. The complaint of the attorney general was unverified. No provision is made in the law for administering oaths to the witnesses who might testify before the secretary of state on the hearing, or for securing or compelling the attendance of witnesses, either on the part of the state or of the party accused. The complaint may as well be made by an irresponsible individual as by the attorney general, and the party complained of might readily find itself in the position of being cited to appear and show cause why its authority to do business should not be revoked, or why its charter, if a domestic corporation, should not be forfeited, on mere unverified allegations of some irresponsible or vindictive person, and, on appearing, find itself wholly powerless to present any defense by reason of the inability to compel the attendance or secure the testimony of witnesses. All these things might enter into the consideration of some of the questions presented by this appeal, as reasons why on demurrer the statute should be construed with strictness.

A great part of the argument of the appellant is in support of its contention that the act in question violates § 85 of the Constitution of this state, in that it attempts to confer upon an administrative officer judicial power. Section 85, supra, reads: "The judicial power of the state of North Dakota shall be vested in a supreme court, district courts, county courts, justices of the peace, and in such other courts as may be created by law for cities, incorporated towns, and villages." A similar statute, but requiring action by the court, was passed upon and sustained in State v. Drayton, 82 Neb. 254, 23 L.R.A.(N.S.) 1287, 130 Am. St. Rep. 671, 117 N. W. 768, that, like this, applying only to discriminations for the purpose of destroying business of a competitor.

The question of the distribution of the powers of government to the legislative, executive, and judicial departments under the Constitution has been passed upon many times and by nearly every court of this country, and there can no longer be any doubt that each department is supreme within its own sphere, or that the judicial power of this state has been exclusively vested, under § 85, supra, in the courts. Without any extended citation of authorities, we may call attention to the exhaustive opinion of Judge Hook of the Federal court in Western U.

Teleg. Co. v. Myatt (C. C.) 98 Fed. 335, and to State ex rel. Hovey v. Noble, 118 Ind. 350, 4 L.R.A. 101, 10 Am. St. Rep. 143, 21 N. E. 244, for extended citation of authorities on this subject and quotations therefrom. An eminent author says: "In further consideration of this work of constitution making, it is the ultimate requirement of all political systems in modern times, and in a large sense in all eras, that the organic social force we call government must be vested with three classes of powers in order to make its organization efficient for the social state. The first of these is the ordainment of rules for the civil conduct of men in their relation to each other, and of each to the state. These rules, which should be made to protect each in his liberty against all others, must prescribe what is right and forbid what is wrong, and are generically called laws. Law is the expression of the will of the organic social force (government) in order to conserve the peace of society and protect the liberty of its members. This is the supreme power in the state,— the body politic, acting through the legislative department of the government. The second of these is that which applies the law so made to special cases, which arise from the interrelations of men by contact and contract. It does not make law, but declares the law as applicable to each of such cases. This is the supreme power of the body politic, acting through the judicial department of government. The third of these is that which brings before the judicial department the persons and things as to which contention has arisen for the maintenance of right against wrong; and which executes the mandate of the law as adjudged by the judicial department. These two functions are the supreme power of the body politic exercised through the executive department of government." Tucker, Const. § 59. The same author, after discussing the different departments, continues [§ 66]: "How majestic is this essential unity of the people's will and purpose through diverse and independent agencies for their expression! How true a unity is obtained by not taking the will of the whole without reference to the parts, but the will of each distinct part in order to attain the will of the whole! How superior this to a government based on the majority of numbers! The government of the numerical majority is the mechanism of brute force. Ours is the resultant of the moral forces of intelligent, popular will over brutal selfishness. It will be perceived that this is the security by dividing power and distributing it between agencies independent

in will and action. So that no one person is permitted to wield power in more than one of the three great departments of government, or in more than one of the bodies constituting such department. This maxim for the division of the department of government into three departments, whose functions are to be performed by distinct and independent agents, no one of whom shall be allowed to act in any other, is fatal to the designs of any one department against right and liberty, because such department is powerless unless it can combine all the others in its purpose of usurpation. When the legislative and executive powers are united in the same person or in the same body of magistrates, there can be no liberty, because apprehension may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner. Again, there is no liberty if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would then be the legislator. Were it joined to the executive power, the judge might behave with violence and oppression." And Baron de Montesquieu, in the Spirit of Laws, at chapter 6 of Bk. 2, thus states some of the reasons for maintaining the departments of government separate and independent each of the other: "The political liberty of the subject is a tranquillity of mind arising from the opinion each person has of his safety. In order to have this liberty, it is requisite the government be so constituted as one man need not be afraid of another. When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty, because apprehension may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner. Again, there is no liberty, if the power of judging be not separated from the legislative and executive powers. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor. There would be an end of everything, were the same man or the same body, whether of the nobles or of the people, to exercise those three powers, that of enacting laws, that of executing the public resolutions, and that of judging the crimes or differences of individuals."

No difficulty is presented in the determination that under our system

the legislative assembly cannot delegate duties belonging to one department to another, nor that the secretary of state is not an officer in whom judicial power can be vested. Grant v. Raymond, 6 Pet. 242, 8 L. ed. 384. Great difficulty, however, is often encountered in deciding what acts are executive or administrative and what judicial. Therein lies the difficulty in the case at bar. That the secretary of state is an executive or administrative officer cannot be questioned. The legislative assembly has granted foreign corporations of the character of the relator, in fact, all foreign corporations except insurance companies and certain religious and charitable corporations, the right to do business in this state on filing in the office of the secretary of state duly certified copies of their charters or articles of incorporation, and appointing the secretary of state as attorney to accept service of process. The secretary is required to make a record of such articles of incorporation in a book kept for that purpose. Rev. Codes 1905, chap. 24. He collects a fee for filing and recording such articles, and for filing and recording his certificate of appointment as attorney, but is not required to issue any certificate showing the authority of a foreign corporation to do business within this state. No specific limit is placed upon the time during which a foreign corporation is permitted by such action to do business within this state. It is clear that all the acts and duties of the secretary of state, in the first instance, are purely ministerial. Of what nature are the duties imposed upon him by chapter 258, Laws. 1907 ? If they are executive or administrative, the law is not subject to the objection under consideration. On the contrary, if the duties imposed upon the secretary of state by chapter 258, supra, are judicial in their nature, the law conflicts with the Constitution, and the acts of the secretary in undertaking to enforce the provisions of chapter 258, supra, are in excess of his powers, he is without jurisdiction in the premises, and they are wholly illegal and void.

It may aid in determining these questions to consider briefly what constitutes judicial power. It will be unnecessary to formulate a definition which includes everything which may come under the appropriate title of judicial powers, but only to determine those things or acts which appropriately belong thereunder as applicable to the instant case. Judge Cooley says: "On general principles, those inquiries, deliberations, orders, and decrees which are peculiar to such a depart-

ment must in their nature be judicial acts." Cooley, Const. Lim. 111. And the same author on the same subject says that the judicial department of government is that department which it was intended should interpret and administer the laws. And a definition which we consider appropriate and fully sustained is that judicial power is authority vested in some court, officer, or person to hear and determine when the rights of persons or property, or the propriety of doing an act, are the subject-matter of adjudication.

Official action, the result of judgment or discretion, in such case is a judicial act. 23 Cyc. 1620, and citations; Territory ex rel. French v. Cox (Dist. Ct.) 6 Dak. 501; State v. Le Clair, 86 Me. 522, 30 Atl. 7; Grider v. Tally, 77 Ala. 422, 54 Am. Rep. 65; Owners of Lands v. People, 113 Ill. 309. In United States v. Rider (D. C.) 50 Fed. 406, the court construed an act of Congress providing that, when the Secretary of War shall have reason to believe that any bridge is an obstruction to free navigation, he shall give notice requiring the bridge to be so altered as to render navigation through or under it easy and unobstructed, and imposing a penalty on the controllers of the bridge for failing to make such provisions; and it was held that as power of the Secretary depended upon his having adjudged that the bridge was an obstruction, and that under the terms of the law his adjudication was made final and conclusive, this was judicial power, and that Congress could not delegate such power to the Secretary of War. In Church v. South Kingstown, 22 R. I. 381, 53 L.R.A. 739, 48 Atl. 3, the question before the court related to the liability of a town for the care of a pauper, and three questions were presented for determination: (1) Was the person a pauper? (2) Had he a legal settlement in the town sought to be charged? (3) Had the defendant town failed in the discharge of its duty to suitably care for him? The legislature of Rhode Island had enacted a law providing that when it was claimed a pauper was not suitably cared for by the town to which he was chargeable, upon five days' notice to the commissioners or overseers of the poor of such town, and on continued neglect of the town, complaint might be made in writing to the appellate division of the supreme court or any justice thereof, setting forth the nature of the grievance complained of; and that such division or justice, after ordering notice to the town of the pendency of such complaint, might, in its discretion, appoint a com-

mission who should visit the pauper, and, on hearing evidence and allegations of the parties, report to the court or justice whether the complaint was well-founded. If it appeared from the report of the commissioners that the pauper was not suitably provided and cared for, such court or justice should pass an order requiring the town authorities to provide suitable accommodations and care, etc. And it was held that the statute conferred upon the commission appointed by the court judicial powers, in that it was required to find the facts and apply the law, and that the court or justice was bound by the report of the commission, leaving the court or justice only ministerial duties to perform in the premises, without any power of review. The court held that for determination in that case involved a trial before some tribunal possessing ordinary judicial attributes, and that because a town neglecting or refusing to comply with the order made should be fined rendered it liable to indictment, branding it as criminal, and taking its property without its ever having been legally adjudged to have committed any offense. We may add that it was also held that such proceedings constitute the taking of property without due process of law. In Payton v. McQuown, 97 Ky. 757, 31 L.R.A. 33, 53 Am. St. Rep. 437, 31 S. W. 874, the Kentucky court adopts the definition found in Com. v. Jones, 10 Bush, 749, wherein it is said: "We regard it as an indisputable proposition that where the inquiry to be made involves questions of law as well as fact, where it affects a legal right, and where the decision may result in terminating or destroying that right, the powers to be exercised and the duties to be discharged are essentially judicial." The court in the Payton Case was considering the power attempted to be given by the legislature to a deputy clerk of court to issue injunctions, and held that it was conferring upon a ministerial officer's judicial powers, and that the law was invalid for that reason. The act there under consideration provided that an injunction might be granted without notice when the officer "to whom application is made shall be satisfied, by the affidavit of the applicant, or by other evidence, that irreparable injury will result to the applicant if the injunction be not immediately granted." And the court observes that this requirement clearly demands investigation and consideration judicial in its character.

In State ex rel. Monnett v. Guilbert, 56 Ohio St. 575, 38 L.R.A. 519, 60 Am. St. Rep. 756, 47 N. E. 551, the supreme court of Ohio had un-

der consideration the validity of the Torrens law, which conferred upon the recorder, as held, judicial powers in passing upon the rights of individuals in land, and held that as a ministerial officer he was incompetent to receive a grant of judicial power from the legislature, and that his acts and attempted exercise of such powers were necessarily nullities. To the same effect was People ex rel. Kern v. Chase, 165 Ill. 527, 36 L.R.A. 105, 46 N. E. 454.

The supreme court of Massachusetts, speaking through Chief Justice Bigelow, in Denny v. Mattoon, 2 Allen, 361, 79 Am. Dec. 784, regarding the determination of the solvency or insolvency of a party under the insolvency law, said: "He must be found to be insolvent within the legal signification of that word in order that his property may be taken, the title thereto vested in the assignees, and its proceeds distributed among his creditors. Especially is this true where, as in the case at bar, the proceedings are *in invitum,* and no assent of the debtor, either express or implied, can be had or inferred to aid the course of legal proceedings by which his right to the property is devested and appropriated to the payment of his debts. The determination of the question whether a debtor is so situated in relation to his creditors as to be subject in his person and estate to the provisions of the insolvent laws is, in its nature, the exercise of a judicial power. It is not to be settled arbitrarily or capriciously, but by the application of fixed rules and established principles to facts which may be proved. . . . It must be the result of due inquiry sufficient to satisfy the discretion and convince the judgment of the officer of the law." That case involved the validity of a law reviving a certain invalid judgment, and the principle, being considered, was the usurpation of judicial powers by the legislature.

In Re Sims, 54 Kan. 1, 25 L.R.A. 110, 45 Am. St. Rep. 261, 37 Pac. 135, it was held that power given by statute to the prosecuting attorney to punish for contempt any witnesses disobeying process, or refusing to answer questions when commanded by subpœna issued by such attorney to appear before him, was invalid. In that case it was also held that executive and judicial powers could not be mingled and combined in the same person, at the same time, in the same proceeding. "Judicial tribunals decide upon the legality of claims and conduct. They determine controversies and interpret laws." 6 Am.

& Eng. Enc. Law, 1053, and note. Whether a citizen has been guilty of an offense involving a forfeiture of his right to vote is necessarily a judicial question, which can be constitutionally decided by the judiciary on a full and fair trial, on an indictment or presentment, but cannot be adjudged collaterally or incidentally by the officers of election. Burkett v. McCarty, 10 Bush, 758.

In People ex rel. Martin v. Mallary, 195 Ill. 582, 88 Am. St. Rep. 212, 63 N. E. 508, an act which authorized the managers of the state reformatory to transfer temporarily to the penitentiary certain persons shown to have been previously convicted of crime, or those deemed incorrigible, was held unconstitutional. To the same effect is Re Dumford, 7 Kan. App. 89, 53 Pac. 92. "The secretary of state is a ministerial officer, authorized by law to perform different duties, upon different contingencies. If he makes mistakes of facts in the performance of his functions, his action may be void or voidable only in different circumstances. But he cannot judicially determine the facts on which he acts or refuses to act. This can only be done by the courts." State ex rel. Drake v. Doyle, 40 Wis. 188, 22 Am. Rep. 692.

We will not consider whether the duties imposed upon the secretary of state by the statute in question are judicial rather than administrative. We need not consider the provisions of § 1 further than to call attention to the fact that it makes the doing of any of the acts referred therein a misdemeanor, and the gist of the offense under its terms is the intent and wilfulness of the acts. Section 2 attempts to add a separate and different penalty for such acts, to be imposed by the secretary of state. The requirements are that a complaint shall be made that a corporation chartered in this state, or authorized to do business therein, is or has been guilty of unfair discrimination. After issuing notice fixing a date for hearing, it is provided that, if in the opinion of the secretary of state such corporation has been guilty of such unfair discrimination, the secretary shall so find and shall make a record of such finding upon the records of his office. The penalty provided is that the secretary shall at once forfeit the charter of the corporation, if a domestic one, or immediately revoke and forfeit the permit to do business in the state, if a foreign corporation. It will be seen that his finding, if against the corporation, is the unfair discrimination within the terms of his act. The terms of the act are disclosed by referring back

to section 1; that is to say, that the corporation intentionally, for the purpose of destroying or preventing competition, shall discriminate, or wilfully, for the purpose of such discrimination or unfair competition, refuse to sell, etc. The finding of the secretary must be as to the intent or the wilfulness of the corporation, and the record which he makes is based upon his opinion of the intent or wilfulness. His opinion must be reached as the result of hearing evidence pro and con offered as to the facts of discrimination, and gathering from such evidence and facts the intent or purpose of the corporation complained against, and determining the legal effect of such acts. He must decide whether they conflict with the duties of the corporation under the statute, or are innocently done. It is true that administrative officers must exercise their judgment and discretion on innumerable occasions when called upon to perform official duties. It is true that they must also pass upon or find facts upon which to base their actions, but these acts are done only in the necessary routine of their business or official duties, and are such as people in all occupations must perform in the ordinary exercise of their callings. The province of courts is not only to find the facts from evidence submitted in the proper case, but to apply the law and render judgment; that is to say, determine by the exercise of their judgment and discretion, taking into consideration the facts and the law, what judgment must be imposed. The secretary of state is required, in this instance, to make and record in his official records the finding he makes, and to at once forfeit the charter of each offending domestic corporation, or, if a foreign corporation, cancel its permit to do business in this state. The result is that the corporation is punished by what is in effect a judgment entered by the secretary of state. We fail to distinguish between it and a provision requiring him, in case of such finding, to imprison a private party. The difference in the penalties applicable to a misdemeanor, which the acts are made by the first section of the law, and the penalty authorized under the other sections, is only in kind, and not in principle. If the secretary can punish a domestic corporation, by forfeiting its charter to do business, he destroys a franchise, which is property; he destroys valuable rights, taking thereby from the corporation the right to do business, the very object of its existence, and ofttimes destroying, in a large measure, the value of its property. The same is true as to a foreign corporation. While

its right to do business in the state may not be equal to that of a domestic corporation, and it may not be entitled to the same degree of protection, it is of some value. In the case of the relator it is shown to be of great value. It also appears that the property possessed by it within this state is of a peculiar character, valuable only in the carrying on of the business in which the relator is engaged, and that it will be greatly depreciated, if not totally destroyed, if the relator is driven from the state.

We are not attempting to say what the effect of the law would. be if the decision of the secretary was not required to be based upon his opinion as to the intent or wilfulness of the relator. An entirely different question would be presented on such a statute. We repeat, the act of the secretary provided for by this statute rests not on the act of discrimination or unfair competition, but on his opinion as to intent and purpose of such acts, and his opinion is the result of the exercse of his judgment or discretion upon the evidence submitted, and is far more potent than would be his finding of the simple fact that a greater price is charged at one place than at another, under similar circumstances. He hears evidence, decides upon its weight, he finds some true and some false. He passes upon the intent of the offender, and, if found guilty, affixes the penalty, and the whole proceeding is made a record which excludes the relator from the state. In other words, he notifies, tries, acquits, or convicts, as in his opinion or judgment the facts and the law require. This is the function of courts under the Constitution. It is authority attempted to be vested in an officer to hear and determine when the rights of persons and property, and the propriety of doing an act, are the subject-matter of his adjudication.

We are of the opinion that the legislature by this act attempted to confer upon the secretary of state powers which are clearly judicial in their nature, and that the act is to that extent invalid. We may add that it is difficult, if not impossible, to define judicial powers, and to discriminate between judicial and administrative functions in a given case in a way which will be applicable to every case. It may also be added that the legislature at the same session enacted other statutes, apparently having the same object as the one complained of, but containing provisions which appear to obviate many of the objections found in the act which we are considering. If those statutes are valid, the state

is not left without means of compelling the relator to comply with the requirements of law applicable to it and its business.

It is further urged by the relator that this law does not provide due process. It necessarily follows, from our conclusions as to the delegation of judicial powers to the secretary of state, that this point is well taken.

The judgment of the District Court is reversed.

FISK, BURKE, and GOSS, JJ., concur. MORGAN, Ch. J., did not participate.