STATE OF NORTH DAKOTA EX REL. HENRY J. LINDE, as Attorney General of the State of North Dakota, and Otto Bauer, as a Taxpayer, Relators, v. THOMAS HALL, as Secretary of State of the State of North Dakota.

(159 N. W. 281.)

Capital removed — constitutional amendment — submission to vote — placing on ballot — original writ of injunction to prevent — initiative petition.

1. Original writ of injunction to prevent submission upon ballot at the coming general election of an amendment to § 215 of the state Constitution, to remove the seat of state government from Bismarck to New Rockford. A petition for such a constitutional amendment was filed with respondent, who, unless restrained, will submit said question to ballot. Relators assert that the petition filed is void, claiming that subdiv. 2 of § 202, state Constitution, is not self-executing; and hence that until legislation is passed to make it possible to operate under subdiv. 2, the Constitution cannot be amended by initiative petition.

Held: The legal sufficiency of the petition filed is a judicial, and not a legislative, question.

Petition — legal sufficiency — judicial question — filing — secretary of state — legislative agent — is not — performs only ministerial duty — reviewable in judicial proceedings.

2. In filing such a petition for, and in submitting to a vote, a proposition to amend the Constitution by initiative petition the secretary of state is not a legislative agent, and performs only ministerial duties reviewable in judicial proceedings.

Proposal of amendment — senate and house — by resolution — initiative petition — legislative province — does not involve — state sovereignty — ministerial act.

3. The proposal of constitutional amendments, whether by resolution of the senate and house of representatives or by initiative petition, is not legislation, and involves no legislative act or province, or power of state sovereignty; but is merely a duty ministerial in character, fixed by, and to be exercised only under and by compliance with, the terms of the Constitution.

Constitution — amendment — proceedings — validity of — judicial question.

4. Whether proceedings to amend a Constitution are valid as performed within such constitutional limitations is a proper judicial inquiry, and its determination by court decision is not an invasion by the judiciary of the constitutional

functions, province, and legislative duties of the legislative department of the government.

**Constitution — not self-executing — mandate to legislature — amendments — laws — initiative petition — notice of — publication — signers — percentage required — rule of computation — not definitely fixed — enacting clause — substance or form of.**

5. Subdivision 2 of § 202 of the state Constitution is not, and was not intended to be, self-executing; but is only a mandate to succeeding legislatures to provide laws whereunder the Constitution may be amended by initiative petition. This is the very apparent intention because:

(a) Subdivision 2 contemplates that the publication of notice of submission of such amendments shall be regulated and prescribed by future legislation.

(b) Subdivision 2 contemplates that legislation shall be enacted declaring the percentage of signers actually necessary to propose constitutional amendments, as the words of said subdiv. 2 "of at least 25 per cent" were intended to be but a limitation upon the legislature that at least 25 per cent should be required, but not to declare the percentage necessary, leaving that to future legislative action to determine the proper and necessary minimum percentage to be required, whether that percentage be 25 per cent, or more than 25 per cent.

(c) It is strongly indicative of necessity for future legislation that no definite rule for computation of any requisite percentage of signers is declared under subdiv. 2, while under the constitutional provision as to initiative of legislation the basis is there prescribed as "the whole number of votes cast for secretary of state at the regular election last preceding the filing" of the petition.

(d) The failure to mention or prescribe the substance or form of an enacting clause to constitutional amendments proposed by initiative petition, while the provision for initiative of legislation does prescribe the form of the enacting clause to be used, is strong evidence that future legislation would supplement said subdiv. 2 by defining the form of any enacting clause to be used thereunder.

(e) The history of its enactment, taken in the light of contemporaneous legislative action upon these and other concurrent resolutions introduced in or passing at the legislative sessions of 1911 and 1913, negatives an intent that subdiv. 2 should be self-executing.

(f) Our constitutional provisions were taken from the Oregon Constitution. The omission of the words found in the Oregon Constitution that would have made this provision self-executing, and then so interpreted there by court decision thereon, must be presumed to have been deliberate and intentional and for the purpose of preventing subdiv. 2 from being construed as self-executing.

**Amendment to Constitution — by initiative proceedings — no law permitting — petition void.**

6. As there is no law authorizing any amendment of our state Constitution

by initiative proceedings, the petition is void upon which the respondent threatens to submit this question to vote.

**Submission of question — no law authorizing — injunction — courts should grant.**
7. A court should enjoin submission of such a question where there is no law under which it could be legally submitted to a vote.

**Petitioners — interest in matter — action — sufficient to maintain.**
8. Petitioners have a sufficient interest to maintain this action.

Opinion filed September 11, 1916.

Original writ of this court is ordered issued to enjoin the secretary of state from submitting to vote a void proposition upon capital removal.

*Miller, Zuger,* and *Tillotson, Newton, Dullam, & Young,* and *Benton Baker,* and *Sullivan & Sullivan* for petitioners.

*Lawrence & Murphy, T. F. McCue, J. J. Youngblood, Rinker & Duell, W. M. Jackson, J. S. Cameron, J. A. Manley, N. J. Bothe,* and *C. J. Maddux* for respondent.

Goss, J.   This court issued an order to show cause why it should not issue an original writ of injunction to stay further proceedings in capital removal instituted by the filing with the secretary of state of a petition for submission of a proposed amendment to § 215 of the state Constitution.   Relator asserts among other things that the second subdivision of § 202 of our state Constitution, purporting to authorize initiative and referendum amendment thereof, is not self-executing, and therefore that said petition is void, and that submission of any proposition thereunder should be enjoined.

Respondent, secretary of state, asserts that this court is without jurisdiction or power to interfere with his official action, asserting that when so acting he is a legislative agent of the people and fulfils a legislative function in submitting said matter to vote; and that to stay submission of the question at the coming election, or to make any judicial inquiry as to the legality of the petition filed, is not only judicial interference with legislation in course of enactment, but it is an unwarranted and unconstitutional usurpation of legislative power by the judiciary.

This contention will be first noticed.   It is premised upon the erroneous basic assumption that the enacting of a constitutional amendment

is an exercise of a legislative power confided as legislative subject matter upon the legislative department of government, as is ordinary legislation. While in a sense such may be a political or legislative matter for determination as a political question, Red River Valley Brick Co. v. Grand Forks, 27 N. D. 8–27, 145 N. W. 725, yet in its submission for adoption or rejection neither legislative province nor power is involved. Whether the people by initiative petition or by legislative proposal amend the fundamental law, they are in either instance "merely acting under a limited power conferred . . . by the people, and which might with equal propriety have been conferred upon either house, *or upon the governor,* or upon a special commission, or any other body or tribunal. The extent of this power is limited to the object for which it is given, and is measured by the terms [of the Constitution] in which it has been conferred, and cannot be extended by the legislature to any other object, or enlarged beyond these terms. . . . In submitting propositions for the amendment of the Constitution, the legislature is *not in the exercise of its legislative power or of any sovereignty of the people* that has been intrusted to it, but is merely acting under a limited power conferred upon it by the people." Livermore v. Waite, 102 Cal. 118, 25 L.R.A. 312, 36 Pac. 426, involving a capital removal from Sacramento to San Jose attempted by constitutional amendment; Chicago v. Reeves, 220 Ill. 274, 77 N. E. 237–240; Collier v. Frierson, 24 Ala. 108; and Oakland Paving Co. v. Hilton, 69 Cal. 479, 11 Pac. 3.

"The legislature in executing its functions [in proposing constitutional amendments] does not legislate in a technical sense. The result does not need the approval of the governor. *The duty is ministerial in character.* There is good reason why the manner of procedure so far as material—and the people must be presumed to have settled the question of what is material—must be followed. The power to make law, within fundamental limitations, is inherent in the division of the government formed for that purpose. It does not need any express grant, *but does not include making or proposing fundamental law.* The power to so propose is a special grant, and must be exercised within the scope of the grant." State ex rel. Postel v. Marcus, 160 Wis. 354, 152 N. W. 423.

A lucid exposition of this principle is also found in Ellingham v.

Dye, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915C, 200, and note citing much authority. Submission for adoption by ballot of a new Constitution proposed by the Indiana legislature was there enjoined. The syllabus reads: "The power to declare the law vested in the judicial department of government covers the whole body of law *fundamental* [constitutional] *and ordinary,* and hence whether a legislative action is void for want of power in that body, or because the constitutional forms or conditions have not been followed or have been violated, *may become a judicial question,* and hence the supreme court has jurisdiction to determine and declare that Acts 1911, chapter 118, providing *for the submission by the legislature of a proposed new constitution to the vote of the electors, is void as not within the power of the legislature."* This covers both the jurisdiction of courts over, and the propriety of the remedy of injunction against, submission of a proposed Constitution, when the result must be a nullity. Every contention of respondent is there answered, and the authorities are collected and analyzed so fully that but little, if anything, is left unsaid.

The same distinction is drawn in Carton v. Secretary of State, 151 Mich. 337, 115 N. W. 433, where it is said: "The constitutional convention is indeed the child of the law, *but of the organic law, and not a legislative enactment.* In this state the Constitution is the charter of the [subsequent constitutional] convention, and its sole charter."

For another recent decision to the same effect see Crawford v. Gilchrist, 64 Fla. 41, 59 So. 963, Ann. Cas. 1914B, 916: The syllabus reads: "A determination of whether an amendment to the Constitution has been validly proposed and agreed to by the legislature is to be had in a judicial forum where the Constitution provides no other means for such determination. The act of the secretary of state in publishing and certifying to the county commissioners proposed amendments to the Constitution is in its nature ministerial, involving the exercise of no discretion, and if the act is illegal it may be enjoined in appropriate proceedings by proper parties, there being no other adequate remedy afforded by law. Where an alleged illegal ministerial official act has relation to legislative action, such action may be considered by the courts in determining the validity or invalidity of the ministerial act. This is not an interference by the courts with the legislative department of the government." The opposite is true. Mandamus will not lie to

compel submission under the initiative of an ordinance which would be void if enacted. State ex rel. Davies v. White, 36 Nev. 334, 136 Pac. 110, 50 L.R.A.(N.S.) 195, and note. Mandamus was issued to compel election on recall petition ignored by city council where petition was legal and regular. Good v. San Diego, 5 Cal. App. 265, 90 Pac. 44. "The duty of the council is purely ministerial," and action can be compelled by mandamus. Conn v. Richmond, 17 Cal. App. 705, 121 Pac. 714, 719; Kadderly v. Portland, 44 Or. 118, 74 Pac. 710, 75 Pac. 222; McBee v. Brady, 15 Idaho, 761, 100 Pac. 97; Vincent v. Mott, 163 Cal. 342, 125 Pac. 346; State ex rel. Lynch v. Fairley, 76 Wash. 332, 136 Pac. 374; State ex rel. Atty. Gen. v. Cunning-ham, 81 Wis. 440–504, 15 L.R.A. 561, 51 N. W. 724; Solomon v. Fleming, 34 Neb. 40, 51 N. W. 304; Cascaden v. Waterloo, 106 Iowa, 673, 77 N. W. 333; Macon v. Hughes, 110 Ga. 795, 36 S. E. 247; De Kalb County v. Atlanta, 132 Ga. 727, 65 S. E. 72.

South Dakota, Oklahoma, and Colorado have apparently declared a different rule. State ex rel. Cranmer v. Thorson, 9 S. D. 149, 33 L.R. A. 582, 68 N. W. 202; Threadgill v. Cross, 26 Okla. 403, 138 Am. St. Rep. 964, 109 Pac. 558; People ex rel. O'Reilly v. Mills, 30 Colo. 262, 70 Pac. 322; and Speer v. People, 52 Colo. 525, 122 Pac. 768 (an affirmance by an equal division of justices). An election will not be enjoined for irregularities in the petition or procedure, as distinguished from an absence of law for the entire proceeding. Pfeifer v. Graves, 88 Ohio St. 473, 104 N. E. 529; Duggan v. Emporia, 84 Kan. 429, 114 Pac. 235, Ann. Cas. 1912A, 729.

But that the sufficiency of the petition is a judicial question, as well as the propriety of the remedy of injunction, has already been passed upon by this court in adjudicating the insufficiency of a petition for a state-wide referendum upon a legislative enactment, and holding it to be a judicial question, and in which proceedings in referendum were enjoined because void. State ex rel. Baker v. Hanna, 31 N. D. 570, 154 N. W. 704. On original writ this court therein declared: "As a referendum sets aside or suspends the will of the people as expressed by legislative act, petitions for a referendum should be required to comply strictly with the mandatory constitutional provisions under which a referendum is authorized. To require less is the equivalent of amending said constitutional provisions by court fiat, as well as to be derelict

in enforcing the Constitution itself." The cases cited in State ex rel. Baker v. Hanna, supra; State ex rel. McNary v. Olcott, 62 Or. 277, 125 Pac. 303; State ex rel. Halliburton v. Roach, 230 Mo. 408, 139 Am. St. Rep. 639, 130 S. W. 689; Hammett v. Hodges, 104 Ark. 510, 149 S. W. 667, and above authorities, also fully sustain that holding and these conclusions, i. e., that the secretary of state acts but ministerially. Hence his acts in submitting proposed constitutional amendments to the electorate are subject to judicial review; and the same is in no sense invading or usurping any legislative function.

But counsel reasons that by abuse of judicial review legal passage of any constitutional amendment might be abridged or prevented through staying the process of its adoption, as by enjoining publication of notice or wrongfully and illegally keeping it off the ballot. However this may be, the question is but an incident of the fully recognized judicial power and province to determine constitutionality of legislative act and to declare laws unconstitutional. The same argument of alleged judicial domination of the legislative arm of government has been applied against that power and province of the judiciary. But it has always been accepted that the power to determine constitutionality of legislation is vested in courts, and that such is a judicial question pure and simple. Ellingham v. Dye, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915C, 221, citing a page of authority. This question was settled in the pioneer case of Marbury v. Madison, 1 Cranch, 137, 2 L. ed. 60.

But possible results of an abuse of judicial power will not be presumed upon which to found a reason for denial of court review in such instances. Powers of a court of equity are not measured by what might be done through an arrogant and high-handed abuse of its legitimate authority. The following from Worman v. Hagan, 78 Md. 152–165, 21 L.R.A. 716, 27 Atl. 616, commenting upon a possibility of abuse of executive power as a factor in determining judicial issues presented is apropos. "It may be asked what is to be done in case the governor should violate his duty and wrongfully proclaim an amendment as adopted which in point of fact had been rejected. It would not be becoming in this court to suppose that such a contingency would ever happen. The courtesy due to the executive department forbids us to entertain such a conjecture."

Approved in Gottstein v. Lister, 88 Wash. 462–498, 153 Pac. 595,

testing constitutionality of the prohibition amendment to the Washington Constitution.

Learned counsel for respondent also contend that jurisdiction should be denied for the reasons (1) that all questions for decision are moot, as the people may by negative vote reject the proposed amendment; (2) that the proper exercise of judicial inquiry should be confined to passing upon the validity of amendments as passed, and not to interfere in the progress of their passage; and (3) that relator has shown no peculiar personal or financial interest in the proposed amendment sufficient to entitle him to maintain this action.

These objections were all advanced and answered in Ellingham v. Dye, supra. As to the first and second that court said: "If the legislature was without power to formulate and present the proposed organic law to the people, as we have seen it was, chapter 118 is void, and the mandate of that body that the ballot shall be encumbered with the question of its adoption is of no more force than that of any citizen without authority under the Constitution. The question involved is no more than whether ministerial acts threatened to be done in carrying out the provisions of an unconstitutional act may be enjoined. This, as we have seen, may be done. And there is also authority for the intervention of the courts before proposed constitutional changes have been passed upon by the votes of the electors, and the result declared;" citing Carton v. Secretary of State, 151 Mich. 337, 115 N. W. 429; Wells v. Bain, 75 Pa. 39, 15 Am. Rep. 563; Livermore v. Waite, 102 Cal. 113, 25 L.R.A. 312, 36 Pac. 424; Holmberg v. Jones, 7 Idaho, 752–758, 65 Pac. 563; Tolbert v. Long, 134 Ga. 292, 137 Am. St. Rep. 222, 67 S. E. 826, all closely parallel to this case at bar. These authorities also uphold a taxpayer's right to sue even though his financial hurt be so small as to amount to, as in Ellingham v. Dye, "but the price of a postage stamp." It is there said "the small proportionate sum of the cost of the election which would fall upon appellee as a taxpayer is not in itself sufficient to destroy his competency to sue. 'Where a suit is brought by one or more for themselves and all others of a class jointly interested, for the relief of the whole class, the aggregate interest of the whole class constitutes the matter in dispute.' Brown v. Trousdale, 138 U. S. 389, 34 L. ed. 987, 11 Sup. Ct. Rep. 308."

The same claim of want of interest could be advanced after a void

amendment had passed to an action to raise its invalidity. It would be hard to find a person having a special interest differing from that of every citizen and taxpayer, and the void amendment on such a standard of necessity of interest to sue for years might go unchallenged by one having power to do so, and constitutional rights of every citizen meanwhile be abridged.

Having jurisdiction to proceed with this inquiry, the all-important question propounded by petitioners will be answered. If their contention is sound, that the second subdivision of § 202 of our fundamental law but authorizes legislation facilitating amendments thereto by initiative, and is not self-executing, and therefore inoperative, as yet no such legislation having been provided, it follows that no valid petition to initiate a constitutional amendment has been filed, and the threatened act of the secretary of state would in any event but result in a nullity. In other words, the question presented is whether subdiv. 2 of § 202 of our Constitution, as amended, is self-executing. The following, taken from Cooley's Constitutional Limitations, was adopted in State ex rel. Ohlquist v. Swan, 1 N. D. 5–13, 44 N. W. 492, as one test as to whether a constitutional provision is self-executing, viz: "A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles without laying down rules by means of which those principles may be given the force of law." This test is settled law, and nearly every case on the subject quotes it. "It has been said that the question in every case is whether the language of a constitutional provision is addressed to the courts or to the legislature. Willis v. Mabon (Willis v. St. Paul Sanitation Co.) 48 Minn. 140, 16 L.R.A. 281, 31 Am. St. Rep. 626, 50 N. W. 1110; State v. Kyle, 166 Mo. 287, 56 L.R.A. 115, 65 S. W. 763. A provision that the legislature should make suitable provisions for carrying a constitutional amendment into effect is obviously addressed to the legislature, and is indicative of the intention that such amendment should not become effective until made so by an act of the legislature." 6 R. C. L. 58: citing Tuttle v. National Bank, 161 Ill. 497, 34 L.R.A. 750, 44 N. E. 984; State ex rel. Toledo v. Lynch, 88 Ohio, St. 71, 48 L.R.A.(N.S.) 720, 102 N. E. 670, Ann. Cas. 1914D. 949; Ex parte Wagner, 18 Ann.

Cas. 197, and note (21 Okla. 33, 95 Pac. 435) and also note to 7 Ann. Cas. 628. "One of the recognized rules is that a constitutional provision is not self-executing when it merely lays down general principles, but that it is self-executing if it supplies a sufficient rule by means of which the right which it grants may be enjoyed and protected, or the duty which it imposes may be enforced without the aid of a legislative enactment. In other words, it must be regarded as self-executing if the nature and extent of the right conferred and the liability imposed are fixed by the Constitution itself, so that they can be determined by an examination and construction of its terms, *and there is no language indicating that the subject is referred to the legislature for action.*" 6 R. C. L. 59, citing Willis v. Mabon, supra. "Indeed the question has been said to be one of intention in every case." 6 R. C. L. 57, citing Illinois C. R. Co. v. Ihlenberg, 34 L.R.A. 393, 21 C. C. A. 546, 43 U. S. App. 726, 75 Fed. 873; Tuttle v. National Bank, 161 Ill. 497, 34 L.R.A. 750, 44 N. E. 984; Newport News v. Woodward, 7 Ann. Cas. 625, and note, (104 Va. 58, 51 S. E. 193). "A constitutional provision is self-executing where no legislation is necessary to give effect to it." 6 R. C. L. 57; State v. Caldwell, 50 La. Ann. 666, 41 L.R.A. 718, 69 Am. St. Rep. 465, 23 So. 869. And the nature of the subject matter may also be decisive of the question, as instanced by constitutional guaranties of personal rights and liberties, merely rules of law operating directly as self-executing mandates and guaranties. But with such we are not concerned, they being without the scope of the inquiry, as subdiv. 2 of § 202 under consideration purports to relate to procedure, *viz.,* the method to be followed and the conditions imposed in amending our fundamental law by the initiative.

Applying these tests, we inquire: (1) Was it the intent of those adopting said subdiv. 2 that it should be considered as addressed to the legislature for that body to provide legislation to make it effective by defining its use, safeguarding against its abuse, and further the expressed intention of the amendment, or, instead, should it be considered as any other law and addresed to the court? If the former, it is not self-executing; if the latter, it is. Then again: (2) Does it by its terms indicate that the legislature shall supplement it by procedure necessary to make it effective, or, on the contrary, is it so complete that it "supplies a sufficient rule by means of which the right which it grants

may be enjoyed and protected or the duty which it imposes may be enforced without the aid of legislative enactment?" These questions must be answered, if possible, from the language of the constitutional provision itself, but if that is ambiguous or the answer doubtful, then the field of inquiry is widened, and rules applicable to construction of statutes are to be resorted to. In fact, a wider field of inquiry for information is proper where needed in construing constitutional provisions than legislative enactment. "Constitutions are to be construed as the people construed them in their adoption, if possible, and the public history of the times should be consulted and should have weight in arriving at that construction," are the words of that eminent jurist, Judge Cooley, People ex rel. Bay City v. State Treasurer, 23 Mich. 499, quoted and approved last year in a case closely parallel to this in facts in State ex rel. Blakeslee v. Clausen, 85 Wash. 260, 148 Pac. 28, Ann. Cas. 1916B, 810. And is there any ambiguity in subdiv. 2 of § 202? Is there any necessary thing omitted therefrom? Is it complete or incomplete? It reads, so far as material to this inquiry: "Any amendment or amendments to this Constitution may also be proposed by the people by the filing with the secretary of state *at least six months* previous to a general election of an initiative petition containing the signatures of *at least* 25 per cent of the legal voters in each of *not less than* one half of the counties of the state. When such petition has been *properly* filed, the proposed amendment or amendments shall be published *as the legislature may provide* for three months previous to the general election and shall be placed upon the ballot to be voted upon by the people at the next general election." The well-established rule for construction of constitutional law is "that constitutional provisions, like statutes, always operate prospectively, and not retrospectively, unless the words used or the objects to be accomplished clearly indicate that a retrospective operation was intended." 8 Cyc. 745. As there is nothing in the constitutional provision to indicate any reference was had by it to past legislation, how did those adopting this provision intend notice of proposed amendments to be given? The answer, in the language of this constitutional provision, is "as the legislature *may* provide." And does this mean as the legislature has provided or, instead, as the legislature shall by future enactment provide? Again the constitutional mandate, necessarily mandatory and prohibitive be-

cause under § 21 of the Constitution: "The provisions of this constitution are mandatory and prohibitory *unless by express words they are declared to be otherwise*"—emphatically answers "as the legislature *may* provide," necessarily indicative of future legislative provision for publicity of such proposed amendments before any shall be submitted for adoption under this subdivision.

In scanning this constitutional provision as to whether it is or was intended to be complete as to procedure, and, as such, ready-made for use without further legislation, it is also noticeable that the necessarily ministerial duty of determining whether the petition invoking the power of amendment of the Constitution is sufficient to be "properly filed" is made to depend entirely upon whether it contains "the signatures of at least 25 per cent of the legal voters in each of not less than one half of the counties of the state." This is the only constitutional measure of its sufficiency. The question then naturally arises from what and upon what basis shall the secretary of state compute its sufficiency as to numerical requirements? The answer is by "(all) the legal voters in each of not less than one half of the counties in the state." But how many legal voters are there in each of said counties, and how shall their number be determined? The legislature knew that this standard was, even if certain, hard of ascertainment, and not provided for by general law applicable to this constitutional provision. Otherwise, why did they, in proposing and adopting the corresponding initiative and referendum amendment as to legislation, amending § 25 of art. 2 of the state Constitution, adopted by the same two legislatures and considered at the same times and as a companion measure to this subdiv. 2, find it necessary to particularize by inserting in a much more definite, lengthy, and complete constitutional amendment a measure of computation of ordinary legislation in the words, "The whole number of votes cast for secretary of state at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal voters necessary to sign such petition shall be counted." Why was such omitted here if it was considered so complete as to be self-executing? Shall we find that, notwithstanding this definite provision in less important initiative constitutional guaranties, the legislature and the people in adopting this subdiv. 2 did so with an intent that it should be left without definite rule as to

means of ascertainment and for the conjecture or ascertainment in any way possible of the respondent.   Certainly a census or enumeration was not intended to be taken.   Yet how without that, in a close case as to numbers, can that officer ascertain, with such a degree of exactness as should be required when proceedings looking to the alteration of the Constitution itself is in course of progress, facts necessarily involving computations and enumerations in at least twenty-six different counties, or one half the counties of the state?   If future legislation declaring some standard for guidance and computation was not intended, then why, may we ask, was the same legislature so specific in the less important constitutional provision as to initiative and referendum of ordinary legislation?   In the light of what it did as to the latter, it cannot be said that failure to be more definite here was the result of oversight.   Rather, such discriminating particularity evidences an intentional deliberate omission.   The more reasonable conclusion must be that here, as in also the matter of publication of notice of the proposed amendments, it was intended only to grant a mandate to succeeding legislatures to carry subdiv. 2 into effect by appropriate legislation.

And this conclusion is further strengthened when it is found that neither the form nor the substance of the enacting clause is provided for an initiative petition to be filed under subdiv. 2.   If this was the only uncertainty, it might be doubtful whether it alone would warrant the determination that future legislation was intended before it should be held self-executing, but it is especially significant that these matters are here omitted, while the corresponding amendment as to initiative of legislation has provided both for an enacting clause and its form, by the following: "The enacting clause of the initiative bills shall be, 'Be it enacted by the people of the state of North Dakota.' "   What should be the enacting clause for proposed amendments by initiative under subdiv. 2?   Should it read: "Be it resolved by the people of the state of North Dakota," or "Be it resolved by the people of the state of North Dakota with the senate and house of representatives thereof concurring?"   Or is an enacting clause to be omitted entirely; if so, what in the petition for initiative is to indicate the action taken?

Another question arising is whether the constitutional amendment proposed by initiative is to be printed in full upon the ballot or the substance thereof merely stated in general terms, requiring resort to the

original initiative petition filed. Subdiv. 2 is silent as to these important matters of procedure. Is not this omission further indication that matters of detail were to be left to the legislature, and that, in the language of the authorities, subdiv. 2 is "addressed to the legislature?" It would seem so.

That a court is justified in resorting to concurrent acts of the legislature or matters of legislative and current history known to all men of ordinary understanding and intelligence at the time of the adoption of this subdivision 2 has the sanction of all authority. "In ascertaining the intent in adopting an amendment to the Constitution providing for the referendum of new laws, courts may resort to the history of such legislation, the contemporaneous construction, the changes made, the context and subject matter, and the purpose and spirit of the act, and the form in which the idea has been fashioned in other states." Syllabus in State ex rel. Blakeslee v. Clausen, 85 Wash. 260, 148 Pac. 28, Ann. Cas. 1916B, 810. In the opinion it is there said: "Following an agitation sustained by persistent propaganda the plan [initiative and referendum] was framed in words and adopted as a part of the fundamental law in several states of the Union. The state of Washington, though not the first to adopt an amendment to its Constitution, did not borrow the idea from any of the states which had adopted it. The agitation in its favor did not ripen quite so soon in this state; but, at the time other states adopted it, the idea of direct legislation was a live question which, like most questions of great public interest, became so persistent that it could be settled only by adoption or rejection. It must be kept in mind that the theory of direct legislation and the referendum is a thing neither new nor original. On the other hand, the purpose, the limitations on the legislature, and reservations of the people attempting its exercise, are to be gathered from the words, context, subject matter, reason, and spirit of the enactment, just as any other law or declaration of fundamental right is to be ascertained. In ascertaining the purpose and its limitations and reservations we may well look to the form in which the idea has been fashioned in other states *and their experiences,* assuming that the legislature and the people had these in mind, and if evil, that they intended to avoid them; if good, that they intended to adopt them. . . .

"Several years before the legislature submitted the amendment to

our Constitution the people of Oregon had adopted the initiative and referendum with practically no limitations. . . . It was a matter of common knowledge that under this unbridled license to refer legislation the state university had been denied the benefit of an appropriation for its support and maintenance. That one of the state institutions, exercising an essential function of the state, had been crippled and embarrassed, and but for the pledge of private credit would have been destroyed for a time at least. .. . . We may well assume that the people of this state had no intention of falling into the error that Oregon had made, and so framed their Constitution that our government and its institutions should not be put to the embarrassments that might follow an agitation which could be supported and a vote compelled by a number of electors so small that it may be said to be merely nominal." This is recited as well illustrative of the right of courts to resort, in construing constitutional provisions, to matters of history and experience had by other states from the adoption of similar principles as a part of their Constitutions. The importance of this will develop later in a comparison of similar constitutional provisions with our own, developed from, if not taken almost verbatim from, the same constitutional provisions of Oregon discussed in this Washington case.

Under this situation, with the duty confronting us of taking judicial notice of the source from which sprung our constitutional provisions as to initiative of constitutional amendments and initiative and referendum of ordinary legislation and similar contemporaneous legislative action, which includes, besides our present two constitutional and statutory initiative amendments, all those additional concurrent resolutions that passed the legislature of 1911, providing for recall of the judiciary and all public officers by popular vote, and introduced by Senator Bessesen as a companion measure to chap. 93, of the Session Laws of 1911, introduced by the same gentleman, providing for a wide-open initiative and referendum on all legislative matters, and which has become our present constitutional amendment as to initiative and referendum on legislative matters; and again that the same legislature passed chap. 94, a house bill, introduced by Representatives Doyle and Ployhar, providing for recall of all public officers, and legislation by the initiative and referendum of all kinds of legislation; and for the future adoption of amendments to the state Constitution, and amended pro-

cedure in impeachment, all in one lengthy and elaborate concurrent resolution,—each and every of these provisions specifically and carefully provide that they shall be self-executing, in words or effect that "this amendment shall be self-executing, but legislation may be enacted especially to facilitate its operation," and showing not only an expressed intent, but careful attention, to provide that they should be self-executing, and as guarding against leaving anything essential for future legislatures to make operative, should they become fundamental law.

All this legislation is what may be properly termed radical in kind. The counterpart is conservatism, and we find that these same legislatures, besides submitting these radical measures, also submitted a conservative proposed constitutional amendment to § 202, and which has without change become § 202, including subdiv. 2 thereof. And the significant fact is that § 202, as so proposed and passed, has wholly failed to provide, except by barest and uncertain inference, if at all, that it shall be self-executing, while all the radical amendments specifically declare in common and exact language: "This amendment shall be self-executing, but legislation may be enacted to facilitate its operation," language found verbatim in the initiative and referendum constitutional amendments of the Constitution of Nevada, also earlier taken from Oregon, State ex rel. Dotta v. Brodigan, 37 Nev. 37, 138 Pac. 914. The plain concurrent resolution, and the recall, and general initiative measure, the Ployhar bill, House Bill No. 133 of the 1913 legislature, all failed of adoption in the 1913 legislature. While the Gibbens bill, chap. 89, Session Laws 1911, and the Bessesen initiative and referendum as to legislation, concurrent resolutions, passed both legislatures and a vote of the people, and are constitutional amendments. This omission in the Gibbens measure, the present § 202, to provide that it shall be self-executing, is significant, in view of the fact that two legislatures had all these various principles before them. This omission was by no mere accident. The measure itself was a conservative one and intended to be such, and as such it was not intended to be self-executory. And the history of these measures in the 1913 legislature is strongly corroborative of this conclusion. The constitutional section under discussion was again there introduced in original form by Senator Gibbens as senate bill No. 73. It early passed the senate and was messaged to the house. The house had passed the Ployhar-Blakemore

35 N. D.—4.

bill as house bill No. 133, the original Ployhar-Doyle resolution pass-ing the 1911 legislature, and this measure providing for the initiative and referendum, recall, and a provision for impeachment, the 1913 Senate repeatedly refused to pass; while the house, to coerce the senate, then refused passage of not only senate bill 73, this constitutional amendment measure, but senate bill 32, introduced by Senator Overson, the original Bessesen measure as to initiative and referendum of legisla-tion, which had been passed as senate bill 93 of the 1911 session, and is our present constitutional amendment providing for the initiative and referendum of legislation.   Late on March 7th, 1913, the last legislative day of that session, and during the last closing hour of the senate session, an attempt was made to pass house bill 133, the Ployhar-Blakemore measure.   It failed in passage, and thereby there was passed up to the House of Representatives all responsibility for the defeat of all such legislation.   The house recanted, and as a result senate bill 32 and senate bill 73 were passed at the very close of the 1913 session, and were messaged to the senate and signed.   Consult Senate Journal, pp. 1547–1601, and 1619, and House Journal, pp. 2005, 2006 and 2063–2066, 2071, 2072.   All these bills were hotly debated in every phase and very carefully and thoroughly considered and discriminately acted upon, the radical measure as to constitutional enactment being refused passage, while the conservative one was ap-proved.   And as a matter of current history it was known that the opposition to the enactment of any measure to permit constitutional amendment by initiative petition was strongly opposed by many firm believers in the prohibition plank, § 217 of our state Constitution, which prohibitionists considered might be jeopardized by any initiative sys-tem for constitutional amendment.   Such opposition to the more radical measure in all probability caused its defeat, and the adoption instead of the constitutional amendment containing subdiv. 2 of § 202.   In its formulation care was used that it should not be self-executing, and that the percentage of signers required should be comparatively high.   And this leads to another and probably all-sufficient reason in itself to de-clare this provision not self-executing, strongly evidencing the legis-lative intent that future legislation was necessary to make it effective. We refer to the percentage required, and *which is uncertain.*   A petition must contain signatures "of at least 25 per cent."   *This is merely declar-*

*atory of a minimum,* leaving to subsequent legislation to fix the minimum, which must be "at *least* 25 per cent," and to classify and vary accordingly, if necessary, any required percentage to initiate different amendments to the Constitution as legislative wisdom may regard necessary in view of widely different constitutional subject matter. To illustrate, it is probably within the grant of legislative authority by subdiv. 2 for the legislature to declare necessary a higher percentage to initiate a constitutional amendment to operate to change the seat of government of this state or the state university, the state agricultural college, its normal schools, and other public institutions fixed by the Constitution, or to amend the prohibition constitutional guaranty, than would be necessary to initiate a rule for taxation. Engstad v. Grand Forks County, 10 N. D. 54, 84 N. W. 577. All this was intended to be left to future legislative wisdom, with the limitation that "at least 25 per cent of the legal voters in each of not less than one half of the counties of the state" should be required in any event, but that the actual percentage to be required to operate under subdiv. 2 should be fixed by legislative act. And the same is probably equally true as to the period before an election at which an initiative petition to amend fundamental law shall be required to be filed. It is doubtful if it was intended to be left as indefinite for operative purposes as declared by the words of subdiv. 2, the only requirement as to time being "at least six months previous to a general election." Would the filing of a petition one year and six months or two years before a general election be sufficient compliance with this provision? Likewise, it was left to legislative discretion to determine what should be placed upon the ballot in voting upon such a proposed amendment.

But not only does the history of the enactment and of the times point to this conclusion, but still even more conclusive reasons exist. Oregon was looked to as the place of origin of not only these *ideas,* but as the place from which these constitutional provisions themselves were taken. They had been tried there for years. As early as 1904 in Kadderly v. Portland, 44 Or. 118, 74 Pac. 710, 75 Pac. 222, this legislation had been passed upon and held not to be in conflict with § 4 of article 4 of the United States Constitution guarantying to every state a republican form of government. Since 1902 the Constitution of that state had contained the initiative and referendum provisions whose phraseology

is very closely followed by our measures. And the supreme court of that state as early as 1907 had held Oregon's constitutional provision self-executing in Stevens v. Benson, 50 Or. 269, 91 Pac. 577. So all that was necessary to have our subdiv. 2 of § 202 self-executing beyond all doubt was for our legislature to borrow the remainder of the constitutional provision, and provide in this act, as in chap. 86, Session Laws 1911, the Plain resolution, that "the secretary of state and all other officers shall be guided by the general laws and this act in filing and submitting initiative and referendum petitions until legislation shall be especially enacted therefor." The Oregon constitutional provision reads: "Petitions and orders for the initiative and for the referendum shall be filed with the secretary of state and in submitting the same to the people he *and all other officers shall be guided by the general laws and the act submitting this amendment until legislation shall be especially provided therefor."* Notice their almost identical as well as peculiar phraseology. This has been held self-executing in Stevens v. Benson, supra. The same legislature in 1911 adopted it almost verbatim as to the Plain bill and also as to the Bessesen measure, our present constitutional provision as to initiative and referendum of ordinary legislation. There can be no doubt that this language came from the Oregon initiative constitutional provision quoted. But not content with that, the last clause of the present constitutional provision as to legislation states: "This amendment shall be self-executing, but legislation may be enacted to facilitate its operation." If the companion measure to subdiv. 2 was carefully made *self-executing,* and subdiv. 2 was not intentionally made *not* self-executing, why was this provision purposely and deliberately eliminated or omitted from subdiv. 2, while found in the corresponding amendment as to legislation, which also was made doubly certain by an explicit declaration that it should be self-executing.

Oklahoma has held in Ex parte Wagner, 21 Okla. 33, 95 Pac. 435, 18 Ann. Cas. 197, that an identical omission by their legislature while adopting the *same* provision to their Constitution from the *same* source was in itself sufficient evidence of a legislative intent that similar constitutional provisions should *not* be self-executing. Upon that ground that court held them not self-executing. And Missouri in McGrew v. Missouri, P. R. Co. 230 Mo, 496, 132 S. W. 1077, declares to the same

effect in the following language: "The general rule is that where one state borrows a constitutional provision from another state that has previously been construed by the courts of the latter state, such construction is presumed to have been adopted along with the provision; the reason for said rule is that if it were intended to exclude the previous construction, the legal presumption is that the terms of the provision *would be so changed as to effect that intention.*" This is only what was done and in law presumed as intended by the omission mentioned in failing to embody in subdiv. 2 of § 202 the Oregon provision making it self-executing, already construed in that state and adopted almost literally in the corresponding amendment authorizing the initiative as to ordinary legislation.

And this is no new rule of statutory or constitutional construction. In Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95, on an election statute construed in Wisconsin before its adoption here, it is said: "We are of the opinion that the Wisconsin authorities cited are controlling in this case," and all the votes cast in the city of Kenmare were thrown out, resulting in creating the county of Renville. See also Com. v. Hartnett, 3 Gray, 450; Pennock v. Dialogue, 2 Pet. 1, 7 L. ed. 327; Hogg v. Emerson, 6 How. 437, 482, 12 L. ed. 505, 524. And in State ex rel. Dotta v. Brodigan, 37 Nev. 37, 138 Pac. 914, a very similar amendment to their Constitution providing for the initiative and referendum, and which concluded with, "the provisions of this section shall be self-executing, but legislation may be especially enacted to facilitate its operation," borrowed from the Oregon Constitution, was nevertheless held not to be self-executing because of other provisions incorporated therein tending to negative the express declaration that the same was self-executing, and to signify that further legislation was intended to be required to make it operative.

And it would seem improbable that the legislature in submitting, and the people in adopting, this constitutional provision, intended it to be more than a direction to subsequent legislatures to provide, within the limitations therein declared, legislation providing procedure for constitutional amendment by initiative petition. This proposition of capital removal is illustrative in this, that a petition purporting to contain the names of thirty thousand electors of this state has been filed with the respondent, and upon that alone it is insisted that he must

submit to the people the proposition of capital removal through the indirect means of amendment of the Constitution. There are no requirements as to verification of such a petition if this constitutional provision is self-executing. Only the signatures of 25 per cent of the electors in half the counties in the state, or, in other words, the approval of one-eighth of the electorate of the state, is all that is necessary if respondent be correct. While a corresponding removal of a county seat can only be brought about by a petition "verified by the affidavit of each of the signers thereof, stating that he is a resident of the county, a qualified elector therein, and that he personally signed his name thereto, knowing the contents and purposes of the petition" for removal; § 3233, Comp. Laws 1913, and that too by a petition of at least three fifths of the voters according to the votes cast at the last preceding general election, with the manner of submission upon the ballot specifically provided. It is hard to believe that either the legislature or the people would understandingly adopt this constitutional provision unless it was merely as a general rule authorizing legislation. While results of concrete application are not controlling, they may be looked to when the statute or constitutional provision is ambiguous, and where adopted with such a history as here.

We have no desire to thwart the public will or prevent a state-wide election upon any question, unless plainly required to do so. But we are convinced that this provision is not self-executing, and the supreme court of Indiana in Ellingham v. Dye, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915C, 200, at p. 227, has well expressed the frame of mind in which we find ourselves, in the following language: "Where the question presented to a court is a judicial question, it would be sheer, inexcusable cowardice and a violation of duty for it to decline the exercise of its jurisdiction," and to decline to interfere and restrain the submission of this question when it is proposed to do so without any sanction of law. There is no law under which this petition is tendered and filed or under which it can exist in a legal sense as a petition.

The writ prayed for will issue, restraining further proceedings by the respondent in the submission to vote of the matter in question. It is so ordered.

BURKE, J. (concurring). This case has received the most careful

consideration by every member of the court, and my associates have covered the different legal phases so fully that I can add little to what they have written. It has been generally conceded that the amendment in question was not intended to be self-executing. The main controversy has been upon the right of this court to make a declaration to that effect at this time. The argument that appeals to me is this: If there is no law authorizing an election at this time, is it not the duty of this court to make the announcement at once and thus save the costs of the campaign, rather than wait until the election is over and then notify the persons interested that their labors have been in vain? Why should New Rockford be put to the expense of the canvass of the state, if this court knows now that there is no possible chance of a legal election? I concur in the main opinion.

BRUCE, J. (concurring). I concur in the opinion of Mr. Justice Goss. It, to my mind, clearly expresses the intention of the people who voted for and adopted the constitutional provision which is before us.

What the people desired was that they might be enabled of their own initiative to propose constitutional amendments and to have them submitted to the electorate. They wished to avoid the necessity of a prior submission to the legislature, but they never intimated or intended that the right should be unlimited. They expressly provided that a petition signed by at least 25 per cent of the voters should be a prerequisite to the right. They never intended or intimated that any kind of a petition should be sufficient, and whether containing the requisite number of names or not, or whether containing forged names or not, and that there could be no redress as against an election which might be ordered under such a petition until after thousands of dollars had been expended in the useless ceremony of voting for that which at no time could become operative as law. The defendants and respondents do not deny that a sufficient petition must be filed before the election can be legally held and the constitutional amendment adopted. They merely contend that such matters cannot now be inquired into, that the discretion of the secretary of state is at present all controlling, and that it is absolutely immaterial what may be the nature of the petitions and whether every name is forged or not. They admit that

the election, if held, would be a nullity, that is to say if the petitions are in fact insufficient, but they insist upon the right to an election.

One would think, indeed, from this argument that idle voting was the chief industry of the state; that it was our only means of prosperity and of crop production, and that the lead pencil in the election booth was of more importance than crops and homes and schools and state stability and self-respect. Counsel, indeed, seem to appear to believe that we must fritter away our resources like wanton savages; that we must act as children, and for the sake of some alleged theory of popular sovereignty play at holding elections.

The argument of counsel also goes far in the other direction. Its theory, if adopted, would deal a crushing blow to the modern democratic movement which seeks to make the amendment of the Constitution always possible to a majority of the voters and a matter of easy accomplishment. *It puts it into the hands of one officer to decide whether that Constitution shall be amended or not.*

If, indeed, this court, as counsel contends (that is to say the taxpayers and voters, for the court merely acts for the taxpayers and voters), cannot prevent the secretary of state from ordering an election under bogus and forged petitions; if indeed such taxpayer cannot enjoy the privilege of having these petitions scrutinized and examined in the first instance; and if in such matters the secretary of state is supreme,—then he is supreme in all other matters, and in cases where the petitions are unquestionably regular and bona fide. According to the argument, indeed, even in cases where the petitions are regular and bona fide and the people really want an election under them, and are legally entitled to such an election, the secretary of state can refuse to order one merely because he does not personally desire it to be held. If he refuses, according to the logic of counsel, the courts cannot interfere, the taxpayers cannot interfere, and he himself is the autocrat of the Constitution.

The people who adopted the constitutional provision which is before us surely intended no such thing. They were not in the business of "making kings to rule over them." What they were after was a government by law and not a government by men, much less a government by one man.

CHRISTIANSON, J. (concurring). I concur in the opinion prepared

by Mr. Justice Goss. I would stop here, but for the question of jurisdiction raised by the respondent. This question, however, is of such tremendous importance and the determination thereof so vital that it seems impossible to give too much consideration thereto, and I therefore desire to add certain reasons, other than those advanced by my brother Goss, in support of the conclusions reached by him.

The questions presented for determination in this case arise under the recent amendment to the state Constitution providing for the proposal of constitutional amendments by a specified number of voters, by petition, i. e., amendment of the Constitution by the method known as the initiative.

Under the Constitution as it existed prior to the adoption of the amendment under consideration, an amendment to the Constitution might be proposed in either house of the legislative assembly; and if the same was agreed to by a majority of the members elected to each of the two houses, the proposed amendment was entered on the journal of the house with the yeas and nays taken thereon, and referred to the legislative assembly chosen at the next general election, and if a majority of all the members elected to each house in the next legislative assembly so chosen agreed to the proposed amendment, it was then submitted to the people for ratification or rejection. Const. § 202.

The twelfth legislative assembly (1911 session) passed four bills proposing constitutional amendments providing for the proposal of statutes, or constitutional amendments, or both, by initiative petition. Senate bill No. 84, introduced by Senator Plain (Sess. Laws 1911, chap. 86), embraced both constitutional amendments and statutes. This bill expressly provided: "The secretary of state and all other officers shall be guided by the general laws and this act in filing and submitting initiative and referendum petitions until legislation shall be especially enacted therefor. This amendment shall be self-executing, but laws may be enacted for the purpose of facilitating its operation." House bill No. 237, introduced by Representatives Doyle of Foster county, and Ployhar of Barnes county (Sess. Laws 1911, chap. 94), provided for the proposal of laws, resolutions, and constitutional amendments, and the recall of officers. This bill contained full and explicit provisions for putting the same into action, and contained this proviso: "This amendment shall be self-executing, but legislation may be enacted especially to fa-

cilitate its operation." Under the provisions of both the Plain bill and the Doyle-Ployer bill, initiative petitions proposing constitutional amendments required the signatures of only 15 per cent of the legal voters in each county of at least one half of the counties of the state.

. Senate bill No. 5 (Sess. Laws 1911, chap. 93), introduced by Senator Bessesen of Wells county, provided for the initiative and referendum of statutes, and had no application to constitutional amendments. This bill contained explicit directions, and provided adequate machinery, for putting the same into operation; and further, in express terms, provided: "This amendment shall be self-executing, but legislation may be enacted to facilitate its operation."

The amendment which is involved in this controversy was introduced as Senate bill No. 153 (Sess. Laws 1911, chap. 89), by Senator Gibbens of Towner county. This bill related to initiation of constitutional amendments only, and had no reference to the initiation of statutes. It provided that "any amendment or amendments to this Constitution may also be. proposed by the people by the filing with the secretary of state, at least six months previous to a general election, of an initiative petition *containing the signatures of at least 25 per cent of the legal voters in each of not less than one half of the counties of the state.* When such petition has been properly filed *the proposed amendment or amendments shall be published as the legislature may provide for three months previous to the general election,* and shall be placed upon the ballot to be voted upon by the people at the next general election. Should any such amendment or amendments proposed by initiative petition and submitted to the people receive a majority of all the legal votes cast at such general election, such amendment or amendments shall be referred to the next legislative assembly, and should such proposed amendment or amendments be agreed upon by a majority of all the members elected to each house, such amendment or amendments shall become a part of the Constitution of this state. Should any amendment or amendments proposed by initiative petition and receiving a majority of all the votes cast at the general election as herein provided, but failing to receive approval by the following legislative assembly to which it has been referred, such amendment or amendments shall again be submitted to the people at the next general election for their approval or rejection as at the previous general election. Should such amendment or amendments receive a

majority of all the legal votes cast at such succeeding general election, such amendment or amendments at once become a part of the Constitution of this state. Any amendment or amendments proposed by initiative petition and failing of adoption as herein provided, shall not be again considered until the expiration of six years."

It will be noted therefore that the twelfth legislative assembly passed, and referred to the thirteenth legislative assembly, three different measures, relating in whole or in part to, and providing for the proposal of, constitutional amendments by initiative petition: The Plain and the Doyle-Ployhar bills in express terms providing that the proposed amendments were to be self-executing, and permitting constitutional amendments to be initiated by petitions signed by 15 per cent of the legal voters of one half of the counties of the state; and the Gibbens bill, which contained no provision, in express terms, declaring the proposed amendment to be self-executing; and which required initiative petitions to be signed by at least 25 per cent of the legal voters in not less than one half of the counties in the state.

These several measures were again introduced in the thirteenth legislative assembly (1913 session). The Plain bill was introduced by Senator Plain on January 29, 1913, as Senate bill No. 153 (See Senate Journal, p. 210), and when placed on its third reading and final passage on March 3, 1913, was defeated by a vote of 23 ayes to 25 nays, two senators being absent and not voting. Senate Journal, p. 1041.

The Doyle-Ployhar bill was introduced in the house of representatives on January 22, 1913, as house bill No. 133, by Representatives . Ployhar of Barnes county and Blakemore of Cass county (House Journal, p. 317), and was passed by the house of representatives, on February 6, 1913 (House Journal, p. 537). It was made a special order in the senate for March 6, 1913, and passed by a vote of 26 ayes to 23 nays, one being absent and not voting. A motion to reconsider the vote, by which the bill was passed, and that the motion to reconsider be laid on the table, resulted in a tie vote, 24 ayes to 24 nays, two being absent and not voting, and the motion was defeated by the vote of Lieutenant Governor Kraabel, who voted against it. Senate Journal, p. 1347. A motion to reconsider the vote by which the bill was passed was thereupon adopted by a vote of 25 ayes to 24 nays, one being absent and not voting (Senate Journal, p. 1400), and the bill, being placed upon its

third reading and final passage, as defeated by a vote of 24 affirmative to 25 negative votes, one absent and not voting. Senate Journal, p. 1404.

The Bessesen bill was introduced in the senate on January 14, 1913, as senate bill No. 32, (Sess. Laws 1913, chap. 101), by Senator Overson of Williams county (Senate Journal, p. 51). It was passed by the senate on March 3, 1913 (Senate Journal, p. 1076). On March 7, 1913 (the last day of the legislative session), it, together with the Gibbens bill, was referred to a conference committee, and finally passed by both the house and the senate. Senate Journal, 1076, 1576, 1602, 1619; House Journal, 2005, 2066.

The Gibbens bill was introduced by Senator Gibbens as senate bill No. 73 (Sess. Laws 1911, chap. 98), on January 18, 1913. (Senate Journal, p. 98.) It was received in the house on the same day, and afterwards passed with certain amendments, in which the senate refused to concur. On March 7, 1913 (the last day of the session), as already stated, it, together with the Bessesen bill, was referred to a conference committee, and finally passed by both the house and the senate. Senate Journal, 1078, 1586, 1596, 1602, 1619; House Journal, 2006, 2064.

Certain petitions have been filed with the secretary of state proposing that § 215 of the Constitution be amended so as to remove the seat of state government from the city of Bismarck to the city of New Rockford. The relator, who is a qualified elector and taxpayer of the state of North Dakota, has invoked the original jurisdiction of this court, and filed his verified petition asking that a prerogative writ be issued enjoining the secretary of state from submitting the proposed amendment to the voters at the next general election. The relator, among other things, asserts: (1) That the constitutional amendment providing for the proposal of constitutional amendments by initiative petition is not self-executing; that the legislature has provided no machinery for putting the same into action, and that consequently there is no law under which the secretary of state may receive the petitions or submit the proposed constitutional amendment to the voters. (2) That the petitions are insufficient in substance and form; that there is not a sufficient number of names attached to the petitions; that a great number of the alleged names signed thereto are spurious and fictitious, and that a majority of the signatures was obtained by fraud, misrepresentation, and deceit.

The respondent has filed a motion to dismiss the proceedings, and also a demurrer to the petition, asserting that the court has no jurisdiction over the respondent and no power to interfere with his action with respect to the submission of the proposed amendment to the voters, for the reason that the respondent, while performing such acts, is a part of the legislative department of the state of North Dakota.

Logically, the first, and by far the most important, question to be determined is the question of jurisdiction. The answer to this, as well as the other questions raised, must be found in our state Constitution, and, if possible, in the constitutional provision under consideration. Does this provision manifest an intent on the part of its framers, and the people who adopted it, to invest the secretary of state with power to pass upon and determine all questions (including the question of whether the provision is in fact self-executing)? If so, then unquestionably the objections to the jurisdiction are well taken. That the people had the right to vest such power in the secretary of state cannot be questioned (at least not by a proceeding in the courts), because our government is constructed on the principle that the right to institute or alter government and distribute the governmental powers in such manner "as to them shall seem most likely to effect their safety and happiness" is a function inherent in the great body of the people.

In all forms of peaceful and orderly government there must be rules of conduct, i. e., laws. These rules must be formulated, interpreted, and enforced. The functions of government, therefore, naturally divide themselves into three parts,—the making of laws, the interpretation of laws, and the enforcement of laws. In absolute monarchies, these governmental powers were, and are, all combined in, and exercised by, the sovereign king. When the founders of our government instituted the new government and organized its powers, they firmly believed that "there can be no liberty where the legislative and executive powers are united in the same person or body of magistracy; or if the power of judging be not separated from the legislative and executive powers." And in order to safeguard the rights and liberties of the people, they created three separate co-ordinate departments or branches of government: The legislative, the executive, and the judicial. This distribution of governmental powers, so far as practicable, is the fundamental idea in the creation of all our Constitutions, both Federal and state.

This division of governmental power was adopted by the framers of our state Constitution, the legislative power being vested in the legislature, the executive power in the governor, and the judicial power in the courts. Const. §§ 25, 71, 85.

The legislative department has the authority to make, alter, and repeal, the executive department to administer and enforce, and the judicial department to interpret and apply, laws. It is the duty of the legislature to declare what the law shall be, and the duty of the courts to declare what the law is. The judicial department was created for the purpose of, and vested with the power to, apply and construe the Constitution and laws. It is vested with authority to hear and determine when the rights of persons or property, or the propriety of doing an act, is the subject matter of adjudication, and to adjudicate and determine such rights and controversies by appropriate decrees. See 4 Words & Phrases, p. 3860; 2 Words & Phrases, 2d Series, p. 1266.

The state Constitution guarantees that "all courts shall be open, and every man . . . shall have remedy by due process of law, and right and justice administered without sale, denial or delay." Const. § 22. It has reserved to the supreme court original jurisdiction to issue remedial writs, and hear and determine controversies involving questions *publici juris,* and affecting the sovereignty of the state, or its franchises or prerogatives, or the liberties of the people. Const. § 87.

The secretary of state is not a judicial officer or invested with judicial power. State ex rel. Standard Oil Co. v. Blaisdell, 22 N. D. 86, 132 N. W. 769, Ann. Cas. 1913E, 1089. He is an officer of the executive department. And while this office was created by the Constitution as a part of the executive department, the powers and duties thereof were not prescribed by the Constitution, but left for legislative action. Const. § 83. In accordance with the constitutional direction, the legislature prescribed the duties of the secretary of state. Among the duties so prescribed were some relating to elections. The secretary of state was required to receive and file certificates of, and petitions for, nominations for state and district officers, and certify such nominations to the several county auditors of the state. He was also required to perform certain duties with respect to the publication of proposed constitutional amendments. The extent of the power and authority conferred upon the secretary of state with respect to these matters has been frequently

considered by this court, and was well settled at the time the constitutional amendment under consideration was adopted.

In State ex rel. Wineman v. Dahl, 6 N. D. 81, 34 L.R.A. 97, 68 N. W. 418, this court granted a peremptory writ of mandamus, commanding the secretary of state to certify to the auditors o fthe various counties of the state a joint resolution passed by the legislature providing for the calling of a constitutional convention.

In State ex rel. Plain v. Falley, 8 N. D. 90, 76 N. W. 996, application was made for, and this court issued, a peremptory writ of mandamus commanding the secretary of state to certify the legislative nominees of the "Independent and Democratic Party" to the county auditor of Cavalier county. The relators in that case claimed that there had been a fusion of the "Independent" and "Democratic" parties, and that they were the nominees of a joint convention of such parties. The secretary of state, by answer, denied such fusion, and asserted that the "Independent and Democratic Party" had no legal existence or standing as a party under the laws of this state. In disposing of these questions this court said: "Relators contend that none of these question are before us; *that the duties of the secretary of state,* in certifying nominations to county auditors, *are ministerial purely;* and that, if the certificates filed with him are fair on their face, he is without authority to look beyond or outside of the certificates. *In this we think relators are clearly right,* and a few observations touching the statutes and their construction will disclose our reasons for thus holding. We remark, first, that, *if the secretary be clothed with judicial functions to pass upon the legality of all nominations the certificates of which are filed with him, his determinations would be final,* as certainly no provisions for appeal or review can be found in the statute, and the decisions of a special tribunal charged with the duty of deciding a special matter are always final, unless the right of appeal be expressly given. 2 Enc. Pl. & Pr. 22. Further, *if the secretary be clothed with judicial functions in this matter, then the political policy of the state may often turn upon his decision. The power is great, and its exercise by an officer universally recognized as political in character would be dangerous, however able and however honest the incumbent might be. For these reasons we should expect to find the power, if conferred at all, conferred in no uncertain terms.* And yet confessedly there is no express judicial

authority conferred upon the secretary by the statute. At most, it is an implied authority, and, *if implied, the means and instrumentalities for its proper exercise are entirely wanting. He can conduct no formal judicial inquiry. He cannot coerce the production of persons or papers. He cannot enforce testimony under the sanction of an oath. His most earnest effort would with equal facility elucidate or suppress the truth. To imply authority under such conditions, the implication must be practically impossible of evasion.* . . .

"We do not agree with counsel for the relators that no power rests anywhere to prevent the certification to the county auditors of nominations not made in some one of the ways pointed out by statute. If no such power exist, then it was utterly useless to provide in what manner nominations should be made, for, however made, they must be certified down. . . . The certificates filed with the secretary must be kept open to public inspection. There is a purpose in that provision. The secretary is a disinterested party. He has no duty to perform touching such nominations, except to certify them to the proper auditor. That duty every citizen is bound to presume he will perform. But, if improper nominations have been filed, *any citizen interested may apply to a court of competent jurisdiction, where all the facts can be speedily and certainly investigated, and, if nominations other than as prescribed by statute have been filed with the secretary, that officer may be enjoined from certifying the same to the county auditors.* But if no such restraining order be served, it is the duty of the secretary to certify all nominations proper certificates of which have been filed in his office. The law does not allow him to concern himself whether such nominations were or were not properly made, and when he, of his own volition, refuses to certify such nominations, and parties in interest bring proceedings to enforce the performance of such duty, it is no answer upon his part to say that facts exist which would have enabled the proper party, at the proper time and in the proper manner, to procure an order restraining him from certifying such nominations. No such order having been in fact obtained, the existence of the facts did not release his duty."

In State ex rel. Cooper v. Blaisdell, 17 N. D. 575, 118 N. W. 225, his court held that "in the performance of his duties as secretary of state, in certifying the names of candidates for state offices to the different county auditors for printing upon the ballot to be used at the general

election, *the secretary acts in a ministerial capacity,*" and issued a writ of mandamus, compelling the secretary of state to certify to the several county auditors of the state the names of certain persons nominated by petition as candidates of the Socialist party.

In State ex rel. McCue v. Blaisdell, 18 N. D. 55, 24 L.R.A.(N.S.) 465, 138 Am. St. Rep. 741, 118 N. W. 141, this court assumed and sustained its original jurisdiction of a proceeding instituted by an elector, who asked for the issuance of a prerogative writ enjoining the secretary of state from certifying the names of certain persons as candidates for the office of United States Senator.

In State ex rel. Miller v. Blaisdell, 34 N. D. 321, 159 N. W. 401, this court upon the application of Thomas F. Marshall, enjoined the secretary of state from certifying the name of Edward Engerud as a candidate for the office of United States Senator, for the reason that the nominating petition did not specify whether said Engerud was a candidate for the term of office which expired on March 3, 1915, or for the term which expires on March 3, 1917.

In State ex rel. Dorval v. Hamilton, 20 N. D. 592, 129 N. W. 916, this court held the provision in the primary election law to the effect that no nomination shall be made unless the vote cast for state, district, or county offices, is at least 30 per cent of the total number of votes cast for secretary of state of each political party at the last general election, to be unconstitutional and void, and directed the district court to issue a writ of mandamus commanding the county auditor of Cavalier county to place the name of the Democratic nominee for the office of county judge upon the official ballot.

In State ex rel. Williams v. Meyer, 20 N. D. 628, 127 N. W. 834, this court entertained jurisdiction and issued an original writ of mandamus directing that the name of the relator be printed upon the Republican ballot for use at the primary election of 1911, as a candidate for state senator. The questions presented and determined in that case involved a construction of certain constitutional provisions relative to the length of terms of state senators. The question was raised that under the Constitution the state senate was the judge of the election and qualification of its own members, and that consequently the decision of a court on this question would be of no force or effect. In disposing of the question, this court said: "This court does not attempt to say what mem-

35 N. D.—5.

bers shall be seated. It is simply passing upon the question of law presented with a view to determining whether the action of the county auditor is legal in refusing to file relator's petition and to print his name as a candidate for senator upon the primary election ballot. It is unnecessary for us to consider whether our decision may have any effect upon the action of the senate in the premises should a new senator be elected, and both he and the old senator claim seats in the . . . legislature. The question of the power of the courts to direct the action of the auditor in such cases has been so often passed upon that we deem it unnecessary to discuss it."

In State ex rel. Watkins v. Norton, 21 N. D. 473, 131 N. W. 257, this court issued a writ of mandamus commanding the secretary of state to publish, as required by law, a certain act passed by the twelfth legislative assembly.

In State ex rel. Standard Oil Co. v. Blaisdell, 22 N. D. 86, 132 N. W. 769, Ann. Cas. 1913E, 1089, this court held that the secretary of state was not a judicial officer, under the Constitution, and that judicial power could not be vested in him.

It will be observed that in many of the several decisions above referred to, the court either commanded the secretary of state to submit some proposed question, or the candidacy of some person, to the electorate, or enjoined him from so doing. These several decisions were promulgated prior (many of them long prior) to the adoption of the constitutional amendment under consideration, and they firmly established the principle that the secretary of state was not a judicial, but an administrative, officer; that he was invested with no power to pass upon or determine the merits of any controversy arising under the election laws with respect to the submission of candidacies or propositions to the electorate; but that his duties relating thereto were purely ministerial. If he failed to perform a duty imposed by the statute, mandamus would issue to compel action; if he sought to act when, or in a manner, not authorized, injunction would issue to restrain him from acting. The policy of the state as declared in the Constitution and statutes, as well as by the decisions of this court, had been consistently adhered to for a quarter of a century before the adoption of the constitutional amendment under consideration. It is now asserted by respondent that this governmental policy has been abandoned; that the constitutional provision under con-

.sideration manifests an intent to transform the secrtary of state from a ministerial into a legislative officer, and to invest him, in that capacity, with power to pass upon and determine the different questions which may arise with respect to the proposal and submission of constitutional amendments by initiative petition. If the constitutional provision manifests such intent, it is our duty to so declare, and our labors and our duty ends there; but if no such intent is manifested then it is equally our sworn duty to so declare and proceed to a determination of the other questions presented.

Our Constitution provides its own rule of construction. It says: *"The provisions of this Constitution are mandatory and prohibitory unless, by express words, they are declared to be otherwise."*

Let us examine the constitutional provision under consideration and see what, if anything, it said therein to indicate any intent to depart from the former governmental policy or to confer the asserted power upon the secretary of state. The only reference made to the secretary of state in the provision is in the first sentence, which provides that initiative petitions shall be filed with him. Is this indicative of any intent to depart from the former policy or invest him with the powers contended for? Clearly not. He is the logical custodian of such petitions, and has been recognized as such throughout the entire history of the state. He is, and has been, the officer with whom nominating petitions for state officers, under the primary and general election laws, must be filed. There is no requirement that the other duties incident to the operation of this amendment, such as the publication of the proposed amendments, shall be performed by the secretary of state. These matters are left for legislative action, and may doubtless be imposed by the legislature upon such administrative officer or officers as their judgment may approve. The constitutional provision provides in no uncertain terms:

(1) That initiative petitions proposing constitutional amendments must be filed at least six months previous to a general election, and *that such petitions must contain the signatures of at least 25 per cent of the legal voters in each of not less than one half of the counties of the state.*

(2) *That "when such petition has been properly filed, the proposed amendment or amendments shall be published as the legislature may provide for three months previous to the general election."*

(3) That an amendment or amendments proposed by initiative petition and failing of adoption shall not be again considered until the expiration of six years. One thing is self-evident, either the secretary of state has authority to determine the sufficiency of initiative petitions or he has not. If the secretary is invested with the power asserted and the courts shorn of power to interfere, then the secretary of state may, if he desires, submit proposed constitutional amendments regardless of the sufficiency of the petition or the number or qualifications of the petitioners, or he may refuse to submit such question, even though the petition is clearly sufficient. The courts either have power to interfere or they have not. From this there is no escape. Is there anything said which indicates an intent to invest the secretary of state with any discretion, or confer upon him any greater or different powers with respect to initiative petitions, than those possessed and exercised by him with respect to nominating petitions filed with him under the election laws? I think not. It seems to me that the language contained in the constitutional provision negatives, rather than implies, any intent to confer discretionary or determinative powers upon the secretary of state. The directions and conditions prescribed are given in positive terms. The plain and unmistakable intent manifested by the language of the provision is that a constitutional amendment cannot be proposed by initiative petition unless such petition is signed by the prescribed number of *legal voters*. But "when such petition has been properly filed, the proposed amendment *shall be published,*" and "*shall be placed upon the ballot.*" And if an amendment proposed is rejected at the polls it cannot again be submitted until the expiration of six years. In my opinion the intent manifested by this provision is clearly to confer upon the secretary of state only the same powers which he possessed with respect to nominating petitions filed under the election laws, and his duties are ministerial only; and he can be compelled to act when it is his duty to do so or restrained from acting when he seeks to act at a time or in a manner not authorized.

The people in their Constitution have said that the judicial power in this state, i. e., the power to interpret and apply laws, shall be vested in the courts. And in their Constitution they have created and designated the courts authorized to perform these functions. Yet if respondent is correct in his contention, the power to interpret and apply the

constitutional provision under consideration and determine all questions arising thereunder, including the legal sufficiency of initiative petitions and the qualifications of the signers thereto, is vested, not in the courts, but in the secretary of state, who is not a judicial, but a political, officer. Obviously the interpretation and application of this constitutional provision, and the determination of the various questions likely to arise thereunder, would require exercise of the very highest degree of judicial skill and judgment. It is difficult to conceive of any legal questions of more profound importance to the people of the state. And if it was intended to confer such power upon the secretary of state, we should expect to find the power conferred in positive and unequivocal terms. Yet it is conceded that such power, if conferred at all, is conferred by implication only. Certain language used by this court in State ex rel. Plain v. Falley, 8 N. D. 90, 76 N. W. 996, seems directly applicable: "If the secretary be clothed with judicial functions in this matter, then the political policy of the state may often turn upon his decision. The power is great, and its exercise by an officer universally recognized as political in character would be dangerous, however able and however honest the incumbent might be. For these reasons *we should expect to find the power, if conferred at all, conferred in no uncertain terms. And yet confessedly there is no express judicial authority conferred upon the secretary"* by the constitutional amendment. And if the power be deemed implied, "the means *and instrumentalities for its proper exercise are entirely wanting. He can conduct no formal judicial inquiry.* He cannot coerce the production of persons or papers. He cannot enforce testimony under the sanction of an oath. His most earnest effort would with equal facility elucidate or suppress the truth. To imply authority under such conditions, the implication must be practically impossible of evasion. But so far is [the constitutional provision] our statute from giving such implied authority that, in our view, it expressly withholds such authority."

Respondent suggests, however, that the various questions now presented might eventually be determined by the courts, but that the people should first have an opportunity to reject the proposition, and if they reject it then no question would remain for determination. Again the language and reasoning of Chief Justice Bartholomew in State ex rel. Plain v. Falley, supra, is applicable. If the secretary be clothed with

authority to pass upon questions arising under said constitutional provision, "his determination would be final, as certainly no provisions for appeal or review can be found" therein.

It seems to me that respondent's contention is unsound for another reason. Respondent asserts his right to act under a certain constitutional amendment. If this constitutional amendment (as relator asserts) is not self-executing, then obviously there is no provision of law under which the petitioners could propose, or the respondent submit, constitutional amendments. They would stand precisely in the same position as though this constitutional provision did not exist, because a constitutional provision which is not self-executing is merely addressed to the legislature granting to or imposing upon it, constitutional authority to enact suitable legislation to carry it into effect. State ex rel. Ohlquist v. Swan, 1 N. D. 5, 44 N. W. 492; Doherty v. Ransom County, 5 N. D. 1, 63 N. W. 148; Engstad v. Grand Forks County, 10 N. D. 54, 84 N. W. 577.

As I have already stated, the sovereignty of the people, and their right to alter or reform the existing government, lie at the very foundation of our governmental existence. In fact this right is expressly reserved in our state Constitution. Const. § 2. It has been said that a self-evident corrollary to the right so reserved is "that an existing lawful government of the people cannot be altered or abolished unless by the consent of the same people, and this consent must be legally gathered or obtained." For, "by the Constitution which they [the people] establish, they not only tie up the hands of their official agencies, but their own hands as well; and neither the officers of the state, nor the whole people as an aggregate body, are at liberty to take action in opposition to this fundamental law." Cooley, Const. Lim. 7th ed. p. 56.

And "an attempt by the majority to change the fundamental law in violation of the self-imposed restrictions is unconstitutional and revolutionary. Although the vote of the people may be overwhelming in adopting a Constitution formulated by a convention not legally called, it would be the duty of the executive and judiciary and all officers sworn to support the old Constitution to resist to the utmost the installation of government under the new revolutionary Constitution. If overpowered, the new government would be established, not by peaceful means, but by actual revolution. The unauthorized action of a con-

vention cannot be ratified by the electorate, since those voting at an unauthorized election have no power to represent or to bind those who do not choose to vote." 6 R. C. L. p. 26.

In this state the people have agreed that constitutional amendments may be proposed by initiative petition signed by at least 25 per cent of not less than one half of the counties of the state. Obviously an attempt to submit a proposition upon petitions signed by a lessor number would not be a compliance with the constitutional provision. It is only by means of a petition signed by the number of signers prescribed by this provision that "an authorized consent of the whole people, the entire state, can be lawfully obtained in a state of peace. Irregular action, whereby a certain number of the people assume to act for the whole, is evidently revolutionary. The people, that entire body called the state, can be bound as a whole only by an act of authority proceeding from themselves. In a state of peaceful government they have conferred this authority upon a part to speak for the whole only at an election authorized by law. It is only when an election is authorized by law, the electors, who represent the state or whole people, are bound to attend, and if they do not, can be bound by the expression of the will of those who do attend. The electors who can pronounce the voice of the people are those alone who possess the qualifications sanctioned by the people in order to represent them, otherwise they speak for themselves only, and do not represent the people." Wells v. Bain, 75 Pa. 39, 15 Am. Rep. 571.

And "it is the duty of the courts to enforce the provisions of an existing Constitution in reference to matters connected with proposed changes in the Constitution as in other cases, and therefore they may be called on to compel the proper state officials to accept petitions filed under the initiative and referendum law for the purpose of proposing amendments, or to publish a proposed constitutional amendment as required by the Constitution, or to compel the making of a proclamation that a certain amendment has been adopted, or to compel the submission of duly proposed amendments, or to restrain the improper submission of amendments." 6 R. C. L. 32.

The second question presented is whether the constitutional provision is self-executing. Again we are required to ascertain the intent of the framers and of the people who adopted it. For "the question in such

cases is always one of intention, and to determine the intent, the general rule is that courts will consider the language used, the objects to be accomplished by the provision, and the surrounding circumstances, and to determine these questions from which the intention is to be gathered, the court will resort to intrinsic matters when this is necessary." 8 Cyc. 754. And, "it is settled by very high authority that in placing a construction on a Constitution, or any clause or part thereof, a court should look to the history of the times, and examine the state of things existing when the Constitution [or the provision] was framed and adopted." 6 R. C. L. 51.

It is not the function of a Constitution to serve as a Code. "Its purpose is to prescribe the permanent frame work of the system of government and assign to the different departments their respective powers and duties, and to establish certain fixed principles on which government is founded."

A self-executing constitutional provision is said to be "one which supplies the rule or means by which the right given may be enforced or protected or by which a duty may be performed." 8 Cyc. 753. It is a provision which is complete in itself and needs no further legislation to put it into force. Davis v. Burke, 179 U. S. 399, 45 L. ed. 249, 21 Sup. Ct. Rep. 210. But a constitutional provision which merely indicates "a line of policy or principles, without supplying the means by which such policy or principles are to be carried into effect," is not self-executing "and will remain inoperative until rendered effective by supplemental legislation." 8 Cyc. 759.

Some of the provisions of our state Constitution are self-executing, others are not. Thus our state Constitution contains the following provision: "No person, association or corporation shall within this state, manufacture for sale or gift, any intoxicating liquors, and no person, association or corporation shall import any of the same for sale or gift, or keep or sell or offer the same for sale, or gift, barter or trade as a beverage. The legislative assembly shall by law prescribe regulations for the enforcement of the provisions of this article and shall thereby provide suitable penalties for the violation thereof." Const. § 217.

In the early case of State ex rel. Ohlquist v. Swan, 1 N. D. 5, 44 N. W. 492, it was asserted that this provision was a self-executing enactment, and as such repealed the prior license law. This court, however,

held that it was not self-executing, and that, until supplemental legislation was enacted to carry the same into effect, it was only a declaration of principles and without force to repeal the prior license law.

In Engstad v. Grand Forks County, 10 N. D. 54, 84 N. W. 577, this court considered that part of § 176 of the Constitution reading as follows: "and the legislative assembly shall by a general law exempt from taxation property used exclusively for school, religious, cemetery or charitable purposes." This provision was held to be not self-executing. The court said: "The Constitution does not, in the clause we have quoted, purport to exempt any property from taxation. On the contrary, the clause under consideration lays a command upon the legislative assembly, and requires that body, by general law, to exempt certain property from taxation, among which is property used exclusively for charitable purposes. This clause, therefore, is clearly not self-executing. Its very terms look forward to and require ulterior action upon the part of the lawmaking branch of the government."

The constitutional provision under consideration in the case at bar provides that: "the proposed amendment shall be published as the legislature *may provide* for three months previous to the general election." This language is prospective. "And constitutional provisions, like statutes, always operate prospectively, and not retrospectively, unless the words used or the objects to be accomplished clearly indicate that a retrospective operation is intended." 8 Cyc. 745. See also 6 R. C. L. 33; Shreveport v. Cole, 129 U. S. 36, 32 L. ed. 589, 9 Sup. Ct. Rep. 210.

The legislature has enacted no legislation providing for such publication. But the respondent contends that the laws in existence at the time the amendment was adopted should be applied, and that when this is done, legislative direction as to the publication of constitutional amendments proposed by initiative petitions has been given.

The laws upon which the respondent relies are §§ 3188 and 979, Compiled Laws 1913. These sections were originally enacted by the legislature in 1891. Section 3188 merely provides the manner of publication of a constitutional amendment after its adoption by the first legislature and before the selection of the members of the next legislature. Section 979, Comp. Laws 1913, reads: "Whenever a proposed constitutional amendment or other question is to be submitted to the people of

the state for popular vote the secretary of state shall, not less than thirty days before election, certify the same to the auditor of each county in the state and the auditor of each county shall include the same in the publication provided for in § 975. Questions to be submitted to the people of the county shall be advertised as provided for nominees for office in such section."

Section 975, referred to in § 979, requires that ten days before an election, notice thereof shall be given by the county auditor by publication in one or more newspapers within the county, or if there is no newspaper published, then by posting notices thereof at three public places in each precinct.

The laws to which respondent refers were passed with respect to the proposal of constitutional amendments by the legislature. The constitutional provision to which they relate reads: "Any amendment or amendments to this Constitution may be proposed in either house of the legislative assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment shall be entered on the journal of the house with the yeas and nays taken thereon, and referred to the legislative assembly to be chosen at the next general election, and shall be published, as provided by law, for three months previous to the time of making such choice, and if in the legislative assembly so next chosen as aforesaid such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislative assembly to submit such proposed amendment or amendments to the people in such manner and at such time as the legislative assembly shall provide. . . ." Const. § 202. It will be noted that while this constitutional provision directs that a proposed constitutional amendment "shall be published, as provided by law, for three months previous" to the election at which the members of the legislative assembly to whom the proposed amendment has been referred are chosen it prescribes no length of time for the publication thereof prior to the time of its submission to the people for approval, but this is left solely for legislative determination. The legislature directed that such notice be published at least ten days previous to the election. On the other hand, the constitutional provision relating to publication of constitutional amendments proposed by initiative petition states in positive terms that such amendment

"*shall be published as the legislature may provide for three months previous to the general election.*" The only authority given to the legislature (and it is given to the legislature, and not to the secretary of state) is to provide the manner of publication. The necessity of publication, as well as the minimum length of time during which publication must be made, is determined by the constitutional provision. The legislature is given no right, either to dispense with publication or permit publication for a lesser time than that prescribed, but such amendment must be published for a period of at least three months previous to the election. The requirement that a proposed amendment "shall be published as the legislature may provide for three months previous to the general election" is a command addressed to the legislature, and a limitation upon its authority with respect to such publication; *i. e.,* the framers of the constitutional provision and the people who adopted it said to the lawmaking body: "We authorize you to prescribe the mode and manner in which proposed amendments shall be published, and to designate a proper administrative officer, or officers, to cause such publication to be made; but you must in all events cause the same to be published for at least three months previous to the election."

There is a radical difference between the two methods of amending the Constitution. Where a constitutional amendment is proposed by the legislature, it is proposed by representatives of the people and is printed in the proceedings of the legislative assembly, as well as among the legislative acts of that body. This takes place over a year and a half before the next legislative assembly is chosen. The proposed constitutional amendment is then published as required by law for three months previous to the election at which the members of the next legislative assembly are chosen, in order that the people may have further notice before choosing the members of such assembly that the proposed amendment has been referred to and will, or may, be voted upon by the legislators so chosen. The proceedings with reference to the amendment will appear in the house and senate journal. And, if passed, the amendment is again printed in full among the acts of the legislative assembly. And the legislature has further provided that notice of its submission must be given by publication in each county in the state for at least ten days previous to the election at which it is submitted to the electors for adoption. An amendment proposed under this method remains pending

for a considerable length of time, and necessarily is afforded a great deal of publicity. But when an amendment is proposed by initiative petition, it emanates not from any chosen representatives of the people, but from those who prepare, circulate, or sign such petitions. Such amendment is not only submitted to the people at the following general election, but if adopted *ipso facto,* is referred to the legislative assembly chosen at that same election. In order that intelligent action may be taken by the voters, they must be informed in regard to the proposed amendment, and so it is provided that an amendment proposed by initiative petition "shall be published for three months previous to the general election." Under these circumstances, can it be said that the laws adopted by the legislature in 1891 providing for publication of constitutional amendments proposed by the legislature constitute an expression of the legislative intent as to the method and manner in which constitutional amendments proposed by initiative petition under a constitutional provision proposed in 1911, and adopted by the people in 1914, ought to be published? The answer seems obvious.

There are many things, not only in the language of the constitutional provision under consideration, but in the history of its enactment, which negative an intent to propose a self-executing provision. Many of these have been discussed by Mr. Justice Goss, and I shall not attempt to elaborate upon what he has said. It should be remembered, however, that it was the only act relative to the initiative and referendum considered by the twelfth and thirteenth legislative assemblies, which did not purport to be self-executing; that the act relating to the initiative and referendum of statutes provided the necessary machinery for its operation, and contained an express declaration to the effect that it was self-executing; that these two measures were not only passed by the same legislatures, but were referred to, considered and recommended for passage by, the same conference committee of the thirteenth legislative assembly. It is difficult to believe that the members of such conference committee and the members of the thirteenth legislative assembly deemed the proposal of statutes to be of more importance than the proposal of constitutional provisions. The language of the provision under consideration, as well as the history of its enactment, however, leads to the irresistible conclusion that its framers and the people who adopted it

intended that the right conferred should be exercised under such reasonable rules and regulations as the lawmaking body should prescribe.

The right of a small number of electors to propose new legislation or the referendum or repeal of laws enacted by the legislature is in itself a great power, and in order to prevent an abuse thereof, such as the presentation of fictitious or fraudulent petitions, certain safeguards are frequently, and generally, prescribed. Thus, in our sister state, South Dakota, petitioners (proposing initiative or referendum of statutes) are required to add to their signatures their places of residence, their occupation and post-office addresses, and it is made a crime punishable by a maximum penalty of imprisonment for five years in the state's penitentiary for any person to sign any name other than his own to such petition, or for a person not a qualified elector of the state to sign the same. The petitions are also required to be accompanied by the oath of every person who circulates the same, or secures signatures thereto. See Political Code, Comp. Laws 1913, pp. 8–10. While the initiation, suspension, or repeal of laws is a matter of great importance, the proposal of new, or change of existing, constitutional provisions, is of even greater importance. It involves an exercise of the highest functions of sovereignty. If the provision is not self-executing, it constitutes a declaration of principles or policy and authorized the enactment of laws to carry such principles or policy into effect. If the provision is self-executing, it not only declares a policy, but also puts the same into effect as a rule of conduct. In either case it may affect directly the life, liberty, and happiness of every inhabitant of the state.

The members of this court have given to this matter their most anxious thoughts and labor, and have arrived at the best conclusions honest convictions can reach. The intent of the framers and the people who adopted the constitutional provision seems too plain to admit of doubt. This being so, our duty, however unpleasant and embarrassing it may be, is equally plain. We must declare the fundamental law to be what it is. To do otherwise would be a breach of the duties we have sworn to discharge, and a violation of the Constitution we have sworn to support.